**UNITED STATES of America,**

v.

**Eddie M. HARRISON, Appellant.**

**No. 22302.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 6, 1969.

Decided June 27, 1969.

Petition for Rehearing Denied Aug. 27, 1969.

Certiorari Denied Dec. 8, 1969. See 90 S.Ct. 465.

Mr. Alfred V. J. Prather, Washington, D. C., with whom Mr. George J. Thomas,

Washington, D. C., (both appointed by this court) was on the brief, for appellant.

Mr. Clarence A. Jacobson, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, and Charles A. Mays, Asst. U. S. Atty., were on the brief, for appellee. Mr. Robert P. Watkins, Asst. U. S. Atty., also entered an appearance for appellee.

Before BURGER, WRIGHT and McGOW-AN, Circuit Judges.

PER CURIAM:*

This case is an unfortunate example of the interminable and winding course a case may follow before reaching termination in our present system of criminal justice. Appellant is presently appealing his fourth consecutive conviction for the felony murder of one George Brown, who was the victim of a shotgun slaying during the course of an attempted robbery in 1960.

In the first three trials leading to Appellant's conviction, he was tried with co-defendants White and Sampson. The first trial in 1960 resulted in convictions against all three defendants but was necessarily reversed by an unpublished order of this court because White had been represented by an imposter attorney. Harrison v. United States, No. 16,391 (D.C.Cir. June 12, 1962). The second trial in 1963 also resulted in three convictions but was reversed by this court because certain inadmissible confessions had been utilized by the prosecution. Harrison v. United States, 123 U.S.App.D.C. 230, 359 F.2d 214 (1965) (en banc). The third trial in 1966 resulted in convictions against Appellant and White; Sampson was granted a directed verdict of acquittal. On appeal, White's third conviction was reversed because of the use of improper testimony from the first trial; Appellant's conviction was affirmed. Har-

---

* This opinion was prepared prior to June 21, 1969, and is issued pursuant to the

Judgment of this court entered on that date.

rison v. United States, 128 U.S.App.D.C. 245, 387 F.2d 203 (1967). After rehearing en banc was denied by this court, the Supreme Court reversed Appellant's third conviction because testimony given by him at the second trial and used against him in the third trial was found to have been precipitated by the improper confessions utilized in the second trial. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

Approximately two months after the Supreme Court's reversal and remand, Appellant was again tried and now for the fourth time a jury has returned its verdict that he is guilty; it is from this conviction that he appeals.

The prime Government witness at trial, Thomas Young, testified to having had breakfast with Brown, the decedent, on the morning of the fatal shooting. Prior to eating, Young and Brown counted out a substantial sum of Brown's money on the restaurant table in open view of others. Young testified that at the time he saw a person, later identified as Appellant's original co-defendant Sampson, watching the money-counting activity. Young also saw Appellant in the restaurant. When Young and Brown left the restaurant Young noticed that Appellant and Sampson left at about the same time. As Young and Brown walked to Brown's car, Young noticed Appellant, Sampson, and a third person standing up the street near a dark colored, old model Buick automobile. Brown then drove to his nearby home, and Young observed that Appellant, Sampson, and the third person entered the Buick and took the same route that Brown had taken. Less than thirty minutes later Young learned that Brown was dead.

The prosecution also offered testimony that Brown was found that same morning shot to death and wedged inside the doorway to his home. No weapon was found on or near his body; twenty-three hundred dollars was found in his pocket. A neighbor who lived across the street from Brown testified that she heard a loud noise and saw two young Negro males running from the direction of Brown's house; the second youth had a gun protruding from beneath his coat. Additional testimony which had been adduced at the 1963 trial was read into evidence from transcripts of that trial and showed that Appellant, in the company of Sampson and White, had borrowed a 1951 Buick on the evening before the killing. A friend of Appellant, one Valentine, also testified at trial that some days after the killing Appellant had related to Valentine that "he [Appellant] was the fellow that killed him [Brown]." [1]

We are now urged to reverse Appellant's conviction, dismiss the indictment against him and set him free. Appellant argues that he has yet to receive a

---

1. The following testimony developed:
   Q If you will, relate what mister Harrison told you regarding "Cider" Brown.
   A Mr. Harrison said that he walked up to the door with a shortgun (sic) under his coat.
   Q When you say "the door", did he say which door he was speaking of?
   A "Cider" George's door. And knocked on the door. And "Cider" George opened the door, and he evidently saw the shotgun under his coat. And he went inside his coat as if to draw a pistol, and that he was the fellow that killed him.
   Q When you say "he was the fellow that killed him," who was "he"?
   A Eddie.

   Q Eddie was the fellow that killed him. And who is "him"?
   A "Cider" George.
   Q And this conversation took place—now, did the conversation end there, or did it continue?
   A Someone came up the steps in the restaurant.
   Q And when someone came up the steps in the restaurant what happened? When someone came up the steps, did the conversation terminate then?
   A It terminated then.
   Q Did Eddie Harrison ever tell you why he went to "Cider" Brown's house?
   A No.

fair trial for an alleged homicide which occurred more than nine years ago. He has thrice been convicted on the basis of what was later held to be inadmissible evidence, and he contends this, his fourth conviction, was obtained on the basis of the perjured testimony of Thomas Young. He also alleges that the trial court erred in failing to grant a motion for acquittal based on the insufficiency of the evidence, that he has been denied his Sixth Amendment right to a speedy trial, and that the trial court erroneously instructed the jury in several respects. We are bound to agree that these proceedings have traveled a tortuous course with much delay, however, our review of the record of this fourth trial and conviction discloses no basis for disturbing the verdict.

The focal point of Appellant's asserted grounds for reversal lies in the testimony of Young, who had held casual and sporadic employment with Brown for several years prior to Brown's murder. Appellant insists that Young's testimony at this trial in many critical respects was at variance both with a statement made to the police on the day of the killing and his testimony at the first two trials.[2] From this he argues that there is no doubt that Young perjured himself and that the prosecutor knew, or should have known, that Young was doing so; and with this foundation, the conviction can not be sustained.

There is little doubt that inconsistencies are evident when Young's testimony over the course of these nine year proceedings in four trials is examined. It would be remarkable if this were not so. Our concern must be with the quality of the inconsistencies. Among the discrepancies relied upon by Appellant are Young's fourth trial statement that he entered the restaurant and had breakfast with Brown and recalled the amount [$5,400] of the money which was counted as contrasted with Young's first trial testimony that he arrived at the restaurant when Brown "was about finishing" eating and that "I can't say how much [money]" Brown had. Appellant also stresses the fact that Young had previously identified Sampson but not Harrison at the earlier trials; however, when questioned at the fourth trial as to whether he had identified anyone as having been in the restaurant, Young responded:

A I definitely remember in, I think, the first trial having to identify more than one person, getting up to do it just like I did today. But that was years ago.

Q In the second trial did you identify more than one person?

A I don't know whether it was the first or second trial, but I remember it was a few years ago.

At trial, defense counsel seized upon these inconsistencies in an attempt to impeach Young and discredit his testimony which formed the core of the Government's case on the question of attempted robbery. Counsel's cross-examination of Young was vigorous, but as the testimony set forth in the margin indicates,[3] all participants at trial were

2. Young was unavailable and did not testify at the third trial.

3. Q Prior to that * * * did you tell any police officer that, that he counted out fifty-some hundred dollars?

A I can't recall too many police officers questioned me.

Q You don't recall any police officers questioning you?

A Yes. Captain Daly.

Q Captain Daly?

A Daly, I think.

Q Did you tell him.

A That was eight years ago. I really don't recall.

Q Mr. Young did you give a statement to the police?

A I beg your pardon?

Q Did you write out a statement and give it to the police after the death of Mr. Brown?

A I am quite sure I signed something in the Homicide Office, if I remember correctly.

* * * * *

Q In this statement you gave the police you didn't say anything about him counting out $5,000, did you?

well aware that Young was testifying to events which occurred nearly nine years prior to trial. Young freely acknowledged that his memory was not perfect as to details.

■ Also, on some points, Young acknowledged that inaccuracy of his earlier statements and insisted on the reliability of his current testimony.[4] These challenges and retorts could not have been lost on the jury, and it was their function to sift the wheat from the chaff and credit or reject Young's testimony. Given the lapse of time involved in these proceedings and Young's apparent willingness to concede the incorrectness of some of his statements, it was for the jury to decide what weight should be given.[5] Evaluating credibility is not the function of appellate judges.

■ Since Young's testimony was properly before the jury, we must reject Appellant's claim that the trial court incorrectly denied a defense motion for directed verdict of acquittal. We have recently noted:

> The District Judge was required to view the evidence at the close of the Government's case in the light most favorable to the Government's position. Having made this determination based on testimony which was not inherently incredible, the case was for the triers and not the trial judge, and the motion for directed verdict of acquittal was properly denied.

Johnson v. United States, No. 21,851 (D. C. Cir. June 20, 1969); citing Thompson v. United States, 132 U.S.App.D.C. 39, 405 F.2d 1106 (1968); Crawford

A  I am quite sure I told them that.
Q  But in this statement you didn't, did you?
A  No. There is something else on here that wasn't said to me that morning. And yet I see my signature. This definitely wasn't said to me. So I don't know who put in there. That definitely wasn't said to me that morning.

4.  A  *  *  *
There is something else on that statement that I didn't make, because I don't even know the lady on there.
Q  Well, the police when they made this statement, you didn't tell them this, they just made it up and you signed it, is that right?
A  I don't remember signing that, but it is my signature. I don't remember signing any statement—because I am quite sure I read it.
So whoever wrote it evidently did lie, because a policeman can lie.
Q  What part is the lie?
A  About Mary somebody. I don't know—I don't even know her.
*  *  *  *  *
Q  Then what is on here, do you know how it got on?
A  That I do not know.
Q  You didn't tell the police that?
A  I can't recall telling them that. I don't see how I could have made up a lie about somebody I don't know.
*  *  *  *  *
Q  Now, on the morning the police, did they give you a description of a couple of men that supposedly left that restaurant, Key's Restaurant that morning?

A  I don't recall that.
Q  The police said, according to this statement—and—
A  The police said it, but I am saying something different.

5.  Nor did defense counsel rely strictly on cross-examination as his tool to discredit Young. During closing argument he continually referred back to the trial transcript to reiterate the challenges made to Young's testimony. And he constantly tried to "assist" the jury in its determination of Young's truthfulness:
> Suppose, ladies and gentlemen, you had a man who represented to you certain things in the same way and in the same context that Mr. Young represented to you and you heard then thereafter contradictions of his testimony of what he told you. * * * You could not trust the word of a man who spoke as he spoke here and testified here. * * *
> You must decide the guilt or innocence of this man and you must decide the truth or untruthfulness of these things by the same way you would decide the most important decisions of your everyday life. And I say to you that you cannot accept his testimony.
> *  *  *  *  *
> Now how many things, must defense counsel present to you to say to you that you cannot accept Mr. Young's testimony. You simply cannot. It would not be within the realm of human nature to accept it in this kind of a situation, the testimony of that man.

v. United States, 126 U.S.App.D.C. 156, 375 F.2d 332 (1967); Thomas v. United States, 93 U.S.App.D.C. 392, 211 F. 2d 45, cert. denied, 347 U.S. 969, 74 S.Ct. 780, 98 L.Ed. 1110 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). We are satisfied that there was sufficient evidence from which a reasonable jury could conclude that Appellant and his companions saw Brown as a likely prospect for a robbery, followed him to his house, and shot him in the course of the robbery attempt. Appellant's admission to Valentine that he had slain Brown very likely reinforced what was already a strong case.

We have also reviewed Appellant's contentions concerning speedy trial and the trial court's allegedly erroneous instructions. As to the former, it is clear that as of the date upon which the Supreme Court reversed Appellant's third conviction, that Court did not believe he had been deprived of his Sixth Amendment rights.[6] In less than two months he was brought to his fourth trial in the District Court. As to Appellant's challenges to the trial court's instructions, our review

of the charge as a whole does not reveal any basis for concluding that the instructions were faulty.[7]

Affirmed.

6. In considering this contention, the Court noted:

> The petitioner's further contention that he was denied the right to a speedy trial is wholly without merit and was properly rejected by the Court of Appeals. * * * Virtually all of the delays of which the petitioner complains occurred in the course of appellate proceedings and resulted either from the actions of petitioner or from the need to assure careful review of an unusually complex case.

392 U.S. 219, 221–222, 88 S.Ct. 2008, 2009–2010 n. 4 (1968) (footnotes omitted).

7. From his arrest at the age of 18 in 1960 until last Fall when he was released by this court on bail pending appeal—some eight and one-half years—Appellant was continuously in custody. Representations made to this court in connection with that bail application, including those by correction officials, suggest that Appellant has gained the regard of the prison au-

thorities and he may have some unique contribution to offer by reason of his own unusual experience. We are, therefore, in the position of affirming a conviction which, because it carries a mandatory sentence of life imprisonment, is beyond the power of any court to alter; at the same time we are aware of significant indications that some of the rehabilitative purposes of imprisonment may already have been achieved. If we believe, as we must, in these concepts, there is a duty to recognize such manifestations and encourage such progress. This would be no problem if the parole authorities were able to bring their powers to bear on Appellant's case, but the statutory limitations upon eligibility for parole in the case of a life sentence prevent that for several years to come. It may be that consideration will be given outside the judicial process to a modification of Appellant's sentence which would give the parole authorities, in turn, an opportunity to review Appellant's situation; this is the purpose of executive clemency powers.