Michael A. **DIAMEN**, Joseph Nick Sousa, and Joseph Wayne Eastridge, Appellants,

v.

**UNITED STATES**, Appellee.

No. 96–CO–295, 96–CO–299, 96–CO–301.

District of Columbia Court of Appeals.

Argued Dec. 15, 1997 *.

Decided Feb. 25, 1999.

---

* This appeal was initially heard on March 20, 1997 by a division of the court consisting of Associate Judges Ferren and Ruiz and Senior Judge Kern. Judge Ferren retired from the court while the appeal was pending, and he was replaced on the division by Judge Schwelb. The appeal was then reheard by the reconstituted division.

John K. Zwerling, Alexandria, VA, for appellant Diamen.

Arthur F. Mathews ** and Alyza D. Lewin, with whom Andrew B. Weissman, Sara E. Emley, and David G. Gray, Washington, DC, were on the brief, for appellants Sousa and Eastridge.

Channing D. Phillips, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Roy W. McLeese III, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

On January 6, 1975, following a five-week trial, appellants Michael A. Diamen, Joseph Nick Sousa, and Joseph Wayne Eastridge were convicted by a jury of first-degree murder while armed, D.C.Code §§ 22–2401, – 3202 (1996), in connection with the stabbing death of Johnnie Battle. On March 16, 1979, appellants' convictions were affirmed by this court. *Sousa v. United States*, 400 A.2d 1036 (D.C.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 485, 62 L.Ed.2d 408 (1979).

In April 1995, following earlier unsuccessful attempts by Eastridge [1] and Diamen [2] to

---

** The court notes with regret that Mr. Mathews died during the pendency of this appeal.

1. *Eastridge v. United States*, No. 82–387 (D.C. June 16, 1983) (Memorandum Opinion and Judgment).

2. *Diamen v. United States*, No. 84–1358 (D.C. July 31, 1985) (Memorandum Opinion and Judgment).

have their convictions set aside, the three appellants filed a joint motion to vacate their convictions pursuant to D.C.Code § 23–110 (1996). The motion was based on newly discovered evidence, and the appellants also claimed that the trial judge had committed constitutional error at their trial by precluding each defendant from eliciting from any witness or codefendant any evidence that would tend to inculpate any codefendant. ·

The motions judge denied the motion without a hearing. The judge held that the newly discovered evidence had not been presented within two years of final judgment, as required by Super. Ct.Crim. R. 33, and that the affidavits filed in support of the motion were insufficient in any event to require the court to hold a hearing. The judge did not address the appellants' claim that constitutional error was committed at their trial, perhaps because the appellants' convictions had been affirmed on direct appeal, and because the judge may have believed that, as a judge of the Superior Court, he lacked the authority to second-guess a ruling by this court.

On appeal from the denial of their motion, the appellants reiterate the claims made in the trial court, and they contend that the motions judge erred in denying the appellants an evidentiary hearing. We affirm.

### I.

### PROCEDURAL BACKGROUND

The evidence adduced at the appellants' trial is set forth in detail in this court's opinion in *Sousa,* and we confine ourselves to a brief summary. The appellants, all three of whom are white, were members of a motor cycle club called the "Pagans." On November 1, 1974, several Pagans, including the appellants, went to the Godfather Restaurant on Wisconsin Avenue to continue a celebration of the birthday of one of the members of the group, a Pagan named Richard C. Richter.[3] The proprietor of the restaurant, who

was familiar with Richter and his group, directed an employee to deny them service. As the Pagans left the restaurant, they encountered a group of young black men, including the decedent, Johnnie Battle. Insults and hostile words were exchanged, and a Pagan threw popcorn at one of the black men. The unpleasantness escalated into threats of violence, and Battle went to his car to arm himself with a handgun. As he was walking back towards the restaurant, Battle was confronted by several Pagans who were carrying knives. In an apparent attempt to take preemptive action, Battle shot and wounded one of the Pagans, Bruce Hunter. Battle continued to fire, but his pistol jammed, and he began to run. Several of the Pagans then pursued Battle, caught him, and stabbed him to death.

A short time after the murder, the three appellants and their codefendant, Steven Jones, were apprehended by the police when Eastridge's car, which Sousa was driving, went through a red light. Jones had severe cuts on his hand, and blood was found on his clothing and on a newspaper in the vehicle. Small amounts of blood were found on the inside of Diamen's pants and on Sousa's shirt.[4] Several knives were recovered from the automobile and its occupants, and there was testimony, vigorously denied by Diamen, that Diamen had discarded another knife while the vehicle was being searched. According to the testimony of Dorothy Willetts, an associate of several of the Pagans, appellants Sousa and Eastridge, who had been released on bond, admitted to Ms. Willetts that they had participated in the killing of the decedent.

Testifying in their own defense, all three appellants denied any complicity in the pursuit of the decedent or in his murder. Jones also took the stand. Jones admitted that he chased Battle after Battle had shot Hunter. Jones claimed, however, that Battle had eluded him, and that he (Jones) did not participate in the killing and had no knowledge of it. All four defendants were convicted of

---

**3.** Richter later became one of the appellant's codefendants at trial.

**4.** The blood found on Sousa and Diamen was not identified as Battle's.

first-degree murder while armed. The three appellants were sentenced to prison terms of twenty years to life, and each filed a timely notice of appeal.

On direct appeal, the convictions of Diamen, Sousa, and Eastridge were affirmed.[5] The court held that the trial judge did not abuse his discretion by denying the appellants' motions for severance based, *inter alia,* on antagonistic defenses. *Sousa, supra,* 400 A.2d at 1042–43.[6] The court also "examined the multitude of other contentions made by appellants and [found] them to be without merit." *Id.* at 1038 n. 1.

More than sixteen years after this court's affirmance of their convictions, the appellants jointly filed the § 23–110 motion which is the subject of the present appeals. They claimed that a six-year investigation conducted on their behalf by Centurion Ministries[7] has produced evidence exonerating the three appellants and identifying the "real" murderers. The new evidence adduced by the appellants consisted primarily of the following:

1. an affidavit executed in December 1993 by the appellants' former codefendant, Steven Jones, in which Jones admitted his own participation in the stabbing of Battle,[8] claimed that the three appellants were innocent, and asserted that his confederates in the killing were former Pagans Charles Jennings, John Woods, and a third man whom Jones declined to identify; it is undisputed, however, that Jennings and Woods are now deceased;

2. affidavits by three former Pagans who asserted, in 1993 and 1995 respectively, that Woods and Jennings, the two deceased men implicated by Jones, had both admitted their roles in the murder and had stated that the appellants were not involved;[9] these admissions by Woods and Jennings were allegedly made in the late 1970s;

3. an affidavit dated April 6, 1995, by John Gianaris, whom the appellants presented as a previously undiscovered eyewitness to the stabbing, and who stated, more than twenty years after the fact, that he saw "no more than four" men attacking Battle and that no car passed by the area at the relevant time; and

4. several affidavits expanding upon doubts cast at trial on the credibility of Ms. Willetts.

The appellants also claimed in their motion that the trial judge had committed constitutional error as described above. The motions judge, as we have noted, denied the appellants' § 23–110 motion without a hearing. This appeal followed.

## II.

### NEWLY DISCOVERED EVIDENCE AND THE CLAIM OF ACTUAL INNOCENCE

■ The appellants contend that Centurion Ministries' lengthy investigation has resulted in the discovery of new evidence demonstrating their innocence. They assert that this showing of innocence entitles them to relief pursuant to D.C.Code § 23–110. We conclude, however, that in light of the provisions of Rule 33 of the Superior Court's Rules of Criminal Procedure and the applicable case law, the appellants' reliance on newly discovered evidence comes many years too late.

Rule 33 provides in pertinent part:

---

5. Jones, who was considerably younger than the other defendants, received a much shorter sentence, and he did not appeal. The fifth defendant, Richter, was convicted of assaulting one of Battle's companions. Richter's convictions were reversed on grounds unrelated to the present appeals. *See Sousa, supra,* 400 A.2d at 1041–42.

6. The court also rejected Diamen's claim that he was unduly prejudiced by the admission at the appellants' joint trial of alleged confessions of his codefendants, Sousa and Eastridge, to Ms. Willetts.

7. Centurion Ministries is a non-profit advocacy group whose mission, according to its founder and president, is "to free from prison and vindicate those who are completely innocent of the crimes for which they have been wrongfully convicted and sentenced to life or death."

8. At trial, as we have noted, Jones denied his own involvement.

9. Two affiants asserted that Woods explicitly admitted his guilt. A third affiant averred that Jennings implicitly did so.

The Court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice .... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment, but if an appeal is pending, only on remand of the case may the Court grant the motion.

Super. Ct.Crim. R. 33. The appellants' motion was filed twenty years after they were convicted and sixteen years after the affirmance of their convictions.

■ Our local Rule 33 "is identical to the corresponding Federal Rule of Criminal Procedure." *Williams v. United States,* 374 A.2d 885, 889 n. 6 (D.C.1977). It is therefore to be construed consistently with the federal rule and, in the absence of applicable local precedent,[10] we look to the case law construing FED. R. CRIM. P. 33. *See Waldron v. United States,* 370 A.2d 1372, 1373 (D.C. 1977).

■ "The time limitations of Rule 33 are jurisdictional. The court is without power to consider an untimely motion for a new trial." 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 558, at 360 (2d ed. 1982 & Supp.1998) (footnotes omitted); *see also United States v. Smith,* 62 F.3d 641, 648 (4th Cir.1995) (citing WRIGHT). Because Rule 33 requires that a motion based on newly discovered evidence be made within two years after final judgment, the court is without power to grant a motion filed after the expiration of that period. *See, e.g., Guinan v. United States,* 6 F.3d 468, 470–71 (7th Cir. 1993); *Jacobanis v. United States,* 256 F.2d 485, 486 (1st Cir.1958). The two-year limit is strictly enforced. *Herrera v. Collins,* 506 U.S. 390, 409, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *United States v. Kaplan,* 101 F.Supp. 7, 13 (S.D.N.Y.1951) (Weinfeld, J.). A court is precluded from considering newly discovered evidence presented after the expiration of two years even where the court is convinced that "a grave miscarriage of justice has taken place," *Kaplan, supra,* 101 F.Supp. at 11, and where "it is difficult to see how some of the vital evidence now presented could have been available to the defendant during the two-year period." *Id.* at 13.

Although this result may appear harsh,[11] see also Part IV, *infra,* there can be no doubt that it was intended by those who promulgated FED. R. CRIM. P. 33. Prior to 1944, defendants in federal prosecutions "enjoyed sixty days from judgment to move for a new trial on the basis of newly discovered evidence and only three days otherwise." *Smith,, supra,* 62 F.3d at 649 (citation omitted). Thereafter,

[w]hen Rule 33 was adopted in 1944, the Advisory Committee recommended that time limits upon new trial motions based on newly discovered evidence be eliminated. The Committee and its supporters reasoned that *a new trial should always be available when a criminal defendant can introduce new evidence tending to demonstrate his actual innocence. See* 3 WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 558, at 362–63 & nn. 7–8. Although *the Supreme Court rejected the Advisory Committee's proposal, and instead imposed a two-year limit on motions based on newly discovered evidence,* the basic rationale for extending greater latitude to motions based on newly discovered evidence remains the same: to enable the district court to afford relief when new

---

**10.** Neither *Head v. United States,* 489 A.2d 450–51 & n. 1 (D.C.1985) nor *Johnson v. United States,* 385 A.2d 742, 743 (D.C.1978) decides the issue here presented. *See, e.g., District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C.1996) ("the rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question") (citations omitted).

*Junior v. United States,* 634 A.2d 411 (D.C. 1993), cited by our dissenting colleague, holds that a motion for a new trial pursuant to Rule 33

is not a § 23–110 motion for purposes of § 23–110(e), which provides that a trial judge is not required to entertain successive § 23–110 motions. The case has nothing to do with the time limitations applicable to motions for a new trial based on newly discovered evidence.

**11.** The Attorney General of the United States, the nation's chief prosecutor, eloquently urged more than half a century ago that no time limit be placed on such motions. See the Appendix to this opinion.

information bolsters a claim of actual innocence.

*Id.* (emphasis added); *see also Herrera, supra,* 506 U.S. at 409, 113 S.Ct. 853; *Kaplan, supra,* 101 F.Supp. at 13–14. This history demonstrates beyond peradventure the Supreme Court's determination that a new trial may not be granted on the basis of newly discovered evidence after two years have elapsed, regardless of any showing of actual innocence.[12] Indeed, it was for cases involving claims of actual innocence that Rule 33's two-year limitations period was purposely designed.[13]

In the present case, the appellants predicated their motion on D.C.Code § 23–110, a provision which permits a defendant to file his motion "at any time," and not on Rule 33. They contend that the limitations of Rule 33 are not applicable, and that "the court below erred in concluding that appellants' failure to timely file a motion for a new trial under Rule 33 precluded it from entertaining a motion for a new trial based on newly discovered evidence." But "[t]he nature of a motion is determined by the relief sought, not by its label or caption." *Frain v. District of Columbia,* 572 A.2d 447, 450 (D.C.1990) (citation omitted). Insofar as the presentation of newly discovered evidence is concerned, the purpose of the appellants' motion is identical to that served by Rule 33. "By merely designating this a § 2255 motion,[14] the time

constraints applicable to a motion based on newly discovered evidence cannot be so readily circumvented." *United States v. Madonna,* 556 F.Supp. 260, 266 (S.D.N.Y.) (citation omitted), *aff'd,* 697 F.2d 293 (2d Cir. 1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983); *Guinan, supra,* 6 F.3d at 470–71; *United States v. DeCarlo,* 848 F.Supp. 354, 355–58 (E.D.N.Y.1994) (Rule 33's time limits may not be avoided by styling motion as one for a writ of error *coram nobis* ).

■ Moreover, the Supreme Court made it clear in *Herrera* that, even in capital cases, time limitations on motions for a new trial based on newly discovered evidence do not present a constitutional issue cognizable in habeas corpus. The Court pointed out that at common law, a new trial could be granted only during the term of court in which the final judgment was entered. 506 U.S. at 408, 113 S.Ct. 853. The Court also noted that a substantial majority of the states placed time limits on the filing of new trial motions based on newly discovered evidence; indeed, many of those limitations are substantially shorter than the District's two-year period. *Id.* at 410–11, 113 S.Ct. 853.[15] The Court was prepared to assume, for the sake of argument, that *"in a capital case* [16] a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant fed-

---

**12.** The Supreme Court's adoption of Rule 33, and its rejection of the proposal that time limitations be abolished for motions based on newly discovered evidence,

not only show[ ] a deliberate intention to limit to two years the time within which a new trial may be asked on the ground of newly discovered evidence, but also negative[ ] any intention to equate this procedure with that having relation to relief for the deprivation of constitutional rights, which if it amounted to a denial of due process might be made the subject of motion in the nature of application for writ of error *coram nobis* at any time.

*Howell v. United States,* 172 F.2d 213, 216 (4th Cir.) (citation omitted), *cert. denied,* 337 U.S. 906, 69 S.Ct. 1048, 93 L.Ed. 1718 (1949); *see also Kaplan, supra,* 101 F.Supp. at 14. Judge Weinfeld also explained in *Kaplan* that 28 U.S.C. § 2255—the federal analogue of § 23–110—is a "codification of the common law writ of *coram nobis.*" 101 F.Supp. at 11.

**13.** Local Rule 33 provides, as does its federal counterpart, that a motion for a new trial based on grounds other than newly discovered evidence must be filed within seven days after adjudication of guilt.

**14.** 28 U.S.C. § 2255 is the federal counterpart of D.C.Code § 23–110.

**15.** Texas, where Herrera was convicted, is one of seventeen states that required such motions to be filed within sixty days of judgment. 506 U.S. at 410, 113 S.Ct. 853.

**16.** The Supreme Court has recognized that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion) (citations omitted). Obviously, not all protections afforded to defendants in capital cases are automatically available to persons not facing the death penalty.

eral habeas relief *if there were no state avenue open to process such a claim." Id.* at 417, 113 S.Ct. 853 (emphasis added). The Court found it unnecessary to decide whether the lack of such a state remedy would be fatal, however, because Texas, like most jurisdictions, permitted the defendant to seek a pardon from the Governor, *id.* at 411, 113 S.Ct. 853, and because, according to the Court, "[h]istory shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." *Id.* at 417, 113 S.Ct. 853.[17] *Herrera* thus holds that if the time for requesting a new trial has elapsed, the availability of discretionary authority in the Executive Branch

to consider the defendant's newly discovered evidence and to grant him clemency [18] makes it constitutionally permissible to deny the defendant a further judicial forum without considering the merits of his claim of actual innocence.[19]

### III.

## THE ALLEGED CONSTITUTIONAL VIOLATION

■ The five defendants who were indicted as a result of the events of November 1, 1974—Diamen, Sousa, Eastridge, Jones, and Richter—were tried together. In an apparent attempt to avoid a perceived or actual need for severance and multiple trials,[20] the

---

17. The Court observed that the defendant "ha[d] yet to apply for a pardon, or even a commutation, on the ground of innocence or otherwise." 506 U.S. at 416, 113 S.Ct. 853.

18. The appellants in this case likewise have the right to seek executive clemency. *See, e.g., United States v. Harrison,* 136 U.S.App. D.C. 109, 113 n. 7, 419 F.2d 691, 695 n. 7 (per curiam), *cert. denied,* 396 U.S. 974, 90 S.Ct. 465, 24 L.Ed.2d 442 (1969).

19. Other parts of the *Herrera* decision also bear on the proper disposition of these appeals. In *Herrera,* the defendant sought federal habeas corpus review on the ground that the murders of which he had been convicted were actually committed by his brother, Raul Herrera, Sr. (since deceased), and that the execution of an innocent man would be unconstitutional. He supported his motion with affidavits by Raul Herrera, Jr., the defendant's nephew, who claimed to have seen his father commit the murders, and by several other individuals to whom Raul Herrera, Sr. had allegedly confessed the crimes. Holding that the defendant was not entitled to a hearing on his motion, and that a claim of actual innocence, standing alone, is not constitutionally based, the Court went on to state:

Petitioner's affidavits are particularly suspect ... because, with the exception of Raul Herrera, Jr.'s affidavit, they consist of hearsay. Likewise, in reviewing petitioner's new evidence, we are mindful that defendants often abuse new trial motions "as a method of delaying enforcement of just sentences." *United States v. Johnson,* 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946). Although we are not presented with a new trial motion *per se,* we believe the likelihood of abuse is as great— or greater—here.

The affidavits filed in this habeas proceeding were given over eight years after petitioner's trial. No satisfactory explanation has been given as to why the affiants waited until the

11th hour—and, indeed, until after the alleged perpetrator of the murders himself was dead— to make their statements. *Cf. Taylor v. Illinois,* 484 U.S. [400] at 414 [108 S.Ct. 646, 98 L.Ed.2d 798 (1988)] ("[I]t is ... reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed").
\* \* \* \*
This is not to say that petitioner's affidavits are without probative value. Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict. Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility. But coming 10 years after petitioner's trial, this showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo,* to exist.
506 U.S. at 417–19, 113 S.Ct. 853.

It is noteworthy, in light of the foregoing discussion, that two of the persons to whom the appellants now ascribe guilt in this case, Jennings and Woods, are also dead, and that the delay in filing the motion was more than twice as long as that in *Herrera.* "[T]he passage of time only diminishes the reliability of criminal adjudications." *Id.* at 403, 113 S.Ct. 853 (citations omitted). With Jennings and Woods no longer available to present their side of the story, it would be difficult, if not impossible, for the government to contest the new defense theory that these two dead men and an unidentified confederate, and not the appellants, participated with Jones in the murder of the decedent.

20. Prejudice from joinder of defendants may arise "where the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this

judge ruled, as we have noted, that no defendant would be permitted to elicit from any witness information which would tend to incriminate any other defendant.[21] The judge also restricted arguments of counsel accordingly. The appellants contend that this ruling unconstitutionally impaired their right, protected by the Fifth Amendment, to present a defense.[22]

The appellants acknowledge that the constitutional claim that they now seek to raise was presented to and rejected by this court on direct appeal. *See Sousa, supra,* 400 A.2d at 1038 n. 1. The appellants sought rehearing by the division or, in the alternative, by the full court, but their petition was denied. The Supreme Court subsequently declined to review the case. 444 U.S. 981, 100 S.Ct. 484, 485, 62 L.Ed.2d 408. The appellants nevertheless assert that, in light of the newly discovered evidence, this court is free to reconsider their claim of constitutional error. The appellants also fault the motions judge for failing to address that claim in his written order denying their § 23–110 motion. They assert, in effect, that the motions judge erred by declining to overrule this court's holding in *Sousa* that there was no violation at the trial of the appellants' constitutional rights.

## A. The binding authority of the Sousa decision.

▮▮▮ "It is well-settled that where an appellate court has disposed of an issue on appeal, [that issue] will not be considered afresh on collateral attack in a trial court of the same judicial system, absent special circumstances." *Doepel v. United States,* 510 A.2d 1044, 1045–46 (D.C.1986) (footnote and citations omitted); *see also Minick v. United States,* 506 A.2d 1115, 1116–17 (D.C.) (per curiam), *cert. denied,* 479 U.S. 836, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986). We are also bound by the related rule that one division of the court cannot overrule the decision of a prior division. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971); *Minick, supra,* 506 A.2d at 1116–17.

▮▮ This court has not definitively construed the term "special circumstances" as used in *Doepel.* In *Peoples v. Roach,* 669 A.2d 700, 702 n. 5 (D.C.1995), we suggested that "[s]uch special circumstances might consist of an intervening change in the relevant law."[23] In *United States v. Palumbo,* 608 F.2d 529 (3d Cir.1979), the court held that

conflict alone demonstrates that both are guilty ....." *Rhone v. United States,* 125 U.S.App. D.C. 47, 48, 365 F.2d 980, 981 (1966) (per curiam) (citations omitted).

21. The judge's ruling did not affect the right of the defendants to pursue a blame-shifting defense directed at non-defendants, such as Woods and Jennings.

22. The parties disagree as to how inflexible the judge's rule was and as to the degree, if any, to which it prevented the appellants from presenting material exculpatory evidence. Because we conclude, in light of the decision in *Sousa,* that we lack authority to decide the merits of these contentions, we do not address the specific applications of the judge's rule of which the appellants complain. *Cf.* the opinion of Judge Ruiz, *post,* at 528–29.

23. Claiming that our analysis in this regard "misses the point of habeas review under § 23–110," our dissenting colleague cites *Kirk v. United States,* 510 A.2d 499, 504 (D.C.1986) (per curiam) for the proposition that *res judicata* does not apply to § 23–110 proceedings and that the courts of the District of Columbia must be "eternally vigilant in ensuring that prisoners are not subject to unlawful incarceration." In *Kirk,* however, the defendant was relying on a super-

vening change in applicable law which rendered the defendant's sentence unconstitutional, and this court held that "a claim already rejected by an appellate court may be reconsidered on collateral attack *in light of new law which would have exonerated the defendant had it been in force at the time of the direct appeal." Id.* at 504 (emphasis added) (citing *Davis v. United States,* 417 U.S. 333, 342, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974)). In this case, on the other hand, there has been no change in the substantive law relating to the scope of the right to cross-examination. *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), relied on by our dissenting colleague, *post* at 516 n. 4, does not deal with that issue or expand that right.

Context is important. "It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply." *Khiem v. United States,* 612 A.2d 160, 164 (D.C.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (quoting *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C. 1959)). "[W]ords of our opinions are to be read in light of the facts of the case under discussion .... General expressions transposed to other facts are often misleading." *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 89

in the absence of [1] newly discovered evidence that could not reasonably have been presented at the original trial, [2] a change in applicable law, [3] incompetent prior representation by counsel, or [4] other circumstances indicating that an accused did not receive full and fair consideration of his federal constitutional and statutory claims, a § 2255 petitioner may not relitigate issues that were adjudicated at his original trial and on direct appeal.

*Id.* at 533 (footnotes omitted; bracketed numerals added).

 An examination of the four "special circumstances" or "exceptions" identified in *Palumbo* reveals that none of them permits a trial judge to disregard a ruling of the appellate court, or a successor division to second-guess a predecessor division's decision, simply because the trial judge or the successor division disagrees with the earlier division's legal analysis and perceives a constitutional violation where the earlier division found none.[24] On the contrary, each *Palumbo* exception involves a circumstance which prevented the earlier division, *through no legal error of its own*, from correctly deciding the constitutional issue. In other words, the "special circumstances" must be such that, if the original panel had been apprised of them, its decision would have been different. *See Minick, supra,* 506 A.2d at 1117 (on collateral attack, the defendant must show that the initial ruling "is clearly erroneous in light of newly presented facts or a change in substantive law"). Any other reading of the phrase "special circumstances" would undermine the rule of *M.A.P. v. Ryan,* the doctrine of the law of the case, and the need for consistency which these rules represent. Indeed, if we were to adopt the appellants' argument, then a judge of the Superior Court would be free to rule in 1996 that the Court of Appeals erred in 1979 when the appellate court decided, on the same record, the very question which is now before the Superior Court judge. We know of no authority for such a startling proposition.[25]

 Of the four *Palumbo* exceptions, only the first—newly discovered evidence—has any possible application here. The appellants make no claim of a change in applicable law.[26] There is no allegation that their

---

L.Ed. 118 (1944). The language from *Kirk* quoted by our dissenting colleague has no bearing on cases in which there has not been a dispositive change in the law.

**24.** We do not suggest that the trial judge lacked jurisdiction to consider the appellants' constitutional claims. Rather, the judge was required to reject these claims under the authority of *Sousa,* for the appellants have not alleged facts bringing the case within *Doepel* or *Palumbo.*

**25.** Even if this division, and the motions judge, had the authority to second-guess the decision in *Sousa*—and we hold that such authority is lacking—it would surely be incumbent on a trial judge or a successor division, when asked to disregard a decision by a predecessor division, to exercise considerable restraint, and to reverse the earlier holding only if that holding was plainly and obviously wrong. If it were necessary to decide that question, we would be most reluctant to conclude that the appellants have satisfied such an exacting standard.

The right of cross-examination is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (citation and internal quotation marks omitted). "[T]he Confrontation Clause[, however,] guarantees an *opportunity* for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original) (citation omitted). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination ...." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Gardner v. United States,* 698 A.2d 990, 997 (D.C. 1997).

Under the trial judge's rule, each appellant remained free to argue that the evidence against him was weak, and he was not precluded from attempting to shift blame to non-defendants. The appellants have, in our view, failed to demonstrate that there was evidence available to them at the time of trial which could have had a significant impact on the outcome if the rule had been relaxed.

**26.** In *Winfield v. United States,* 676 A.2d 1 (D.C. 1996) (en banc), this court expanded in some measure the circumstances under which a criminal defendant may present evidence that another person committed the offense of which the defendant is accused. The trial judge's ruling now at issue, however, applied only to evidence incriminating *a codefendant,* and it was not based on the "clearly link" requirement that *Winfield* abolished. Moreover, the appellants do not claim

trial counsel were incompetent.[27] Finally, the appellants received a full and fair hearing on their constitutional claim, and they have made no persuasive showing to the contrary.[28]

### B. *Newly discovered evidence and the constitutional issue.*

■ We also conclude that the appellants' newly discovered evidence does not provide any previously unavailable support for their contention that the judge committed constitutional error at their trial. Although the appellants have presented new evidence relevant to their claim of actual innocence, that evidence has no logical or legal bearing on the constitutional issue that they now seek to relitigate.

■ Under the standard articulated in *Palumbo*, a division of this court could properly reconsider the decision in *Sousa* if the appellants produced newly discovered evidence "that could not reasonably have been presented at the original trial . . . ." 608 F.2d at 533. The affidavits secured by the appellants, if true, establish that the exculpatory evidence that they now present was not available in 1975, and that at that time, the appellants had no reasonable opportunity to obtain it.[29] We will also assume, for purposes of this appeal, that at least where newly discov-ered evidence of actual innocence is relevant to a defendant's claim that his constitutional rights have been violated, that evidence may be presented and considered more than two years after final judgment.

But if the court is to reconsider a previously rejected constitutional claim on the basis of newly discovered evidence, then elementary logic surely requires, and *Palumbo* implicitly contemplates, that the evidence must be relevant to the constitutional issue sought to be relitigated, and not just to the question of guilt or innocence. It is useful, in this connection, to compare the appellants' claim here with that of the defendant in a hypothetical case that we consider paradigmatic.

Suppose that a defendant is convicted of murder after the trial judge admits the defendant's confession into evidence, rejecting the defendant's claim that the confession was coerced. The appellate court sustains the finding of no coercion and affirms the defendant's conviction. Ten years later, a conscience-stricken police officer provides the defense attorney with a videotape of the defendant's interrogation. The tape clearly shows the officer's colleagues beating the confession out of the defendant. Armed with his new evidence, the defendant now mounts a collateral attack on his conviction. He contends that his confession was unconstitutionally obtained and that it should have been

---

that the law as stated in *Winfield* applies retroactively to cases concluded prior to the issuance of that decision.

27. The appellants do assert that, by restricting the degree to which their attorneys would be permitted to examine and cross-examine witnesses, the trial judge rendered the attorneys ineffective. This somewhat unusual type of claim of ineffective assistance, however, is secondary to, and depends upon, a showing that, the judge improperly restricted the attorneys. The appellants cannot prevail unless they can persuade a division of this court to hold that the trial judge's substantive rulings, affirmed by an earlier division of this court in *Sousa*, were unconstitutional.

28. The appellants assert that the failure of the court in *Sousa* to address expressly the propriety of the judge's restrictions on cross-examination constitutes a "special circumstance" warranting reconsideration of the issue by this division. We cannot agree. Parties who have been unsuccessful in the trial court, such as these appellants,

often raise a "multitude" of contentions on appeal. *See Sousa, supra,* 400 A.2d at 1038 n. 1. An appellate court's congested calendar often requires summary treatment of at least some of these issues. If unnecessary prolixity is to be avoided, the finality of a decision of this court cannot be permitted to depend on the expansiveness with which a particular issue was addressed.

The appellants also claim that the "actual innocence of the [a]ppellants" and "the constitutional importance of the issue" constitute "special circumstances." But many or most defendants who collaterally attack their convictions claim to be innocent, and every constitutional contention may be viewed as important. To adopt the appellants' broad reading of "special circumstances" would undermine accepted notions of finality, and would reopen a multitude of criminal convictions to collateral attack years after judgment.

29. *E.g.,* the appellants' most important new exculpatory witness, Steven Jones, was telling a completely different story at the time of trial.

excluded from evidence. The motions judge denies relief, deferring to the appellate court's earlier ruling that the confession was properly admitted. The defendant appeals again. Under the *Palumbo* standard, the appellate court is now free to revisit the decision issued on the defendant's direct appeal. This is so because the newly discovered evidence reveals that, contrary to the appellate court's belief at the time of the first appeal, the defendant's constitutional rights have been violated. In our hypothetical, the newly discovered evidence demonstrates that the confession was erroneously admitted and that the defendant was convicted of murder on the basis of evidence that was secured by unconstitutional means.

In the present case, on the other hand, the newly discovered evidence provides no previously unavailable information regarding the question whether the trial judge's ruling impaired the appellants' rights under the Fifth and Sixth Amendments. At the trial, the judge precluded the appellants from presenting certain evidence that they sought to elicit from various witnesses. That restriction was either constitutional, as this court held in *Sousa*, or it was not. The new affidavits by Jones and others which form the basis for the appellants' § 23–110 motion do not illuminate the question whether the judge's restrictions were constitutionally permissible. At most, these affidavits tend to show that, if there was a constitutional violation, then the consequences of that violation would have been even more severe if the appellants had possessed and attempted to adduce the newly discovered evidence, and if the judge had prevented them from doing so.[30] The new information, however, is of no help to appellants in their attempt to establish that the judge's rule was unconstitutional and that significant exculpatory evidence was excluded from the trial.

We do not believe that the Supreme Court's decision in *Schlup, supra* note 23, is contrary to our analysis.[31] In *Schlup*, the Court held that in "an extraordinary case" presenting a "fundamental miscarriage of justice," 513 U.S. at 321, 115 S.Ct. 851, a defendant who had been sentenced to death was entitled to have a successive (and, in the ordinary case, procedurally barred) federal habeas corpus petition heard on the merits, and could assert grounds previously rejected by the state and federal courts, if he was able to demonstrate, on the basis of newly discovered evidence not previously available to him, that no impartial jury could find him guilty beyond a reasonable doubt. *Id.* at 321–32, 115 S.Ct. 851. *Schlup* is thus basically about federalism, and its gist is that a capital defendant[32] who presents newly discovered and compelling evidence of actual innocence may obtain federal habeas review of an otherwise defaulted constitutional claim. There is nothing in *Schlup* to suggest that, on remand, the United States District Judge could simply rule, without new evidence relevant to the constitutional issues, that the prior decisions of the United States Court of Appeals were erroneous and that he was not obliged to follow them. In any event, we conclude that the newly discovered evidence with which the appellants in this case seek to shift blame to two now-deceased Pagans (largely on the basis of an affidavit by a confessed murderer who now admits that he committed perjury at his trial and hearsay statements of uncertain admissibility implicating Jennings and Woods, *see Williamson v. United States*, 512 U.S. 594, 598–602, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)) does not meet the substantive standard articulated in *Schlup* and in the authorities on which *Schlup* relies.

We therefore conclude that, as a division, we are bound by the disposition in *Sousa* of the appellants' constitutional contentions.

---

**30.** At trial, perhaps on account of the judge's rule, counsel for appellants did not interrogate Jones. If counsel had been armed with Jones' 1993 affidavit, they would doubtless have attempted to elicit from him evidence that he was present when Battle was murdered and that the appellants played no role in Battle's death. We can only speculate whether or how the judge would have applied his rule under these circumstances, but the question never arose.

**31.** Although *Schlup* forms the centerpiece of Judge Ruiz' opinion, the case is not mentioned at all in the appellants' main brief, and only tangentially in their reply brief.

**32.** We note that the analysis in *Schlup* has also been applied to cases not involving the death penalty. *See, e.g., Cornell v. Nix*, 119 F.3d 1329, 1332–33 (8th Cir.1997).

We have no occasion to decide what, if any, action the full court could or should take with respect to these contentions in the event of a petition for rehearing en banc.

## IV.

## CONCLUSION

 Although a defendant is presumptively entitled to a hearing on a motion brought pursuant to D.C.Code § 23–110, no hearing is required where his allegations would merit no relief even if true. *See, e.g., Pettaway v. United States,* 390 A.2d 981, 984 (D.C.1978).[33] Having determined that the appellants' newly discovered evidence has been presented too late, and that the appellants' previously rejected constitutional claim is not now viable, we conclude that their § 23–110 motion was properly denied without a hearing.[34]

The foregoing would ordinarily end this opinion. But because the appellants have presented a non-frivolous claim that they have spent many years behind bars for a crime that they did not commit, and because we are constrained to affirm the denial without a hearing of a motion in which they vigorously assert their innocence, we think that a few additional paragraphs are in order. "In the unusual circumstances of this case, the [c]ourt feels that it would be shirking its responsibility if the denial of the motion were made without further comment." *Kaplan, supra,* 101 F.Supp. at 14.[35]

"[F]ew would argue that a criminal defendant who has been convicted of rape or murder must go to the electric chair or stay in prison even if DNA evidence shows that he did not commit the crime." *Merrell Dow Pharm. Inc. v. Oxendine,* 649 A.2d 825, 834 (D.C.1994) (concurring opinion). One who reads Super. Ct.Crim. R. 33 in conjunction with the Supreme Court's decision in *Herrera* is led to the uncomfortable sense that an innocent defendant may be executed or left to rot in jail because conclusive exculpatory evidence, through no fault of his own, came to his attention too late. Such a defendant is, of course, free to apply for executive clemency, but pardons are discretionary, and often politically unpopular as well. Moreover, a defendant cannot fairly be blamed if he regards executive clemency as an insufficient remedy when he did not in fact commit the crime for which he is being pardoned. An innocent man asks for justice, not for mercy. In a powerful dissenting opinion in *Tippitt v. Wood,* 78 U.S.App. D.C. 332, 140 F.2d 689 (1944), Justice Arnold expressed his firm belief that "the courts rather than the executive are the guardians of liberty against arbitrary judicial action." 78 U.S.App. D.C. at 339, 140 F.2d at 696; see also the Appendix, *infra.*

It is, and should be, difficult for a criminal defendant to secure a new trial several decades after the fact. *See, e.g., Dobson v. United States,* 711 A.2d 78, 84 (D.C.1998) ("lapse of time affects the quantum of required proof, as well as the good faith and credibility of the moving party") (citation and internal quotation marks omitted). Putting the blame on people who are dead and who can no longer defend themselves is particularly suspect. *See Herrera, supra,* 506 U.S. at 417, 113 S.Ct. 853.[36] Under Rule 33 as

---

**33.** Diamen and Eastridge had previously filed unsuccessful motions pursuant to § 23–110, and the trial judge was not required to entertain successive motions. D.C.Code § 23–110(e); *see Dantzler v. United States,* 696 A.2d 1349, 1355 (D.C.1997). Because this is Sousa's first collateral attack on his conviction, however, and because his claims are identical to those presented by the other two appellants, we have treated the substantive issues as though they had been preserved, for purposes of § 23–110(e), by all three appellants.

**34.** In light of our decision, we also conclude that the motions judge did not err in denying the appellants' related request for discovery and access to grand jury information.

**35.** In *Kaplan,* Judge Weinfeld joined the defendant and the prosecutor in urging executive clemency. *Id.*

**36.** According to an affidavit filed by an investigator for Centurion Ministries, the president of the Pagan Motor Club (PMC) told her that the club would cooperate in her investigation "so long as it did not involve living PMC members as having been involved in the [m]urder." Explaining his long delay in coming forward and exonerating the appellants, Stephen Jones likewise referred to the "Pagan Code," under which "no Pagan was ever to turn another Pagan in to the police for any reason, even if another Pagan had been arrested falsely for the same crime." It may not

written, however, passage of a relatively short time—two years—acts as an absolute bar, no matter how compelling the showing of innocence may be.

As Professor Wright has written, "[this] can lead to very unattractive results." 3 WRIGHT, *supra*, § 558, at 363. These results can be avoided. More than half a century ago, the version of Rule 33 proposed by the federal Advisory Committee on Criminal Rules would have permitted motions based on newly discovered evidence to be filed " 'at any time before or after final judgment.' " *Id.* at 362. "This proposal was eloquently supported by former Attorney General Homer Cummings, [the nation's chief prosecutor,] who could see 'no reason, in logic, in justice, or in expediency' why there should be any time limit on motions of this kind." [37] *Id.*

But for the time limitation contained in Rule 33, a hearing on the appellants' § 23–110 motion might well be appropriate in this case.[38] In any event, the Superior Court's Board of Judges might wish to consider whether an amendment of Rule 33 in conformity with the former Attorney General's views would be in the interest of justice.

The decision of the motions judge is

*Affirmed.*

### *Appendix*

### Newly Discovered Evidence

The Committee has proposed the abolition of time limitations on motions for a new trial on the ground of newly discovered evidence. This is a courageous and commendable step. The conviction of an innocent person in a federal court is a rarity. Yet, as all human institutions are fallible, such miscarriages of justice have occurred. During my term of office as Attorney General I have known of it in a few instances and was obliged to take steps to retrieve the wrong either by confessing error, if it was not too late to do so, or by securing a pardon. Executive clemency in such an instance is, however, inadequate and unsatisfactory. A judicial remedy should always be available. Such a remedy, in fact, is now open if the newly discovered evidence exculpating the defendant becomes available within a certain time limit. Unfortunately, such evidence is apt to come to light at a later date. There is no reason, in logic, in justice, or in expediency, for limiting the time during which a court may grant a new trial in such cases. I, for one, am not afraid that the courts will be inundated by a flood of frivolous motions of this kind. We may well rely on the good sense of federal judges not to grant such motions except upon sufficient cause.

HOMER CUMMINGS, THE THIRD GREAT ADVENTURE, 3 F.R.D. 283, 287 (1943).

RUIZ, Associate Judge, dissenting: [1]

These appeals present an issue of fundamental importance to the court's role in safeguarding constitutional rights through habeas review: the authority of this court to reconsider a claim that a constitutional violation has led to a serious injustice. Notwithstanding the express language of our habeas statute that "a prisoner . . . claiming the right to be released upon the ground that . . . the sentence was imposed in violation of the Constitution of the United States . . . may move the court to vacate [or] set aside . . . the sentence . . . *at any time*," D.C.Code § 23–110(a) & (b) (1996) (emphasis added), the majority imposes the two-year limitation of Rule 33 of the Superior Court Rules of Criminal Procedure and the judicially-created rule in *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971), to strip this court of authority to even consider whether it should hear appellants' constitutional claim. The majority, while recognizing that appellants present

---

be a coincidence that Jones and other former Pagans now assert that the two men whom they accuse of the crime—Woods and Jennings—are no longer alive.

**37.** We have made Attorney General Cummings' views an Appendix to this opinion.

**38.** We do not, however, decide that question.

**1.** I join with the majority in sadly noting Mr. Mathew's passing while these appeals were pending. I also recognize his and his firm's commitment to these appellants, as well as that of Centurion Ministries.

"non frivolous claims that they have spent many years behind bars for a crime they did not commit," *ante* at 513, nonetheless uncomfortably concludes that Rule 33 "acts as an absolute bar, no matter how compelling the showing of innocence," *ante* at 514. That unsatisfactory result is a self-inflicted and unsupported limitation on the court's authority.

First, the two-year limitation of Rule 33 is directed only to new trial motions "based on the ground of newly-discovered evidence." Rule 33's time limitation does not apply to the post-conviction motions before us, filed under D.C.Code § 23–110, which are centered on a constitutional claim that is enhanced by an assertion of factual innocence based on newly-discovered evidence.[2] The majority repeatedly mischaracterizes appellants' post-trial motions as if they were based exclusively on new evidence, ignoring the constitutional claims at the core of their arguments. As such, these motions were appropriately filed under D.C.Code § 23–110, which provides for review of a sentence "imposed in violation of the Constitution." Under D.C.Code § 23–110, a motion may be filed "at any time."

**2.** With respect to ineffective assistance of counsel claims, which may be filed under both Rule 33 and § 23–110, we have maintained a strict separation between the requirements applicable to each, holding that the procedural limitation on a successive post-conviction motion under § 23–110 is not satisfied by a motion filed under Rule 33. *See Junior v. United States,* 634 A.2d 411, 417 (D.C.1993) ("Our caselaw marks the distinction between Rule 33 motions and § 23–110 motions on the basis of whether the defendant has been sentenced."). Just as we have refused to allow a motion filed under Rule 33 to satisfy § 23–110's procedural limitations, so we should refuse to import Rule 33's time limitation to § 23–110.

**3.** The majority's mistaken characterization of appellants' motions carries over to its citation of inapposite cases. In *United States v. DeCarlo,* 848 F.Supp. 354 (E.D.N.Y.1994), relied upon by the majority, *see ante* at 507, the district court recognized that there is no time limitation applicable to motions brought under 28 U.S.C. § 2255 (the federal counterpart to D.C.Code § 23–110). *See id.* at 356. However, as the motion for new trial in that case was based solely on new evidence, and did not raise any constitutional or legal claim, it was properly considered a Rule 33 motion subject to the two-year limitation. *See id.* That the motion was solely factually-based, and raised neither jurisdictional nor constitutional

The majority heavily relies on *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), to preclude the court's consideration of appellants' new evidence. That reliance is misplaced, however, as the Supreme Court has expressly distinguished a free-standing claim of actual innocence based on newly-discovered evidence, such as presented in *Herrera,* from constitutional claims supported by assertions of actual innocence. *See Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In the latter case, the conviction "may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial." *Id.* at 316, 115 S.Ct. 851. Here, because appellants claim that their trial was constitutionally flawed, the *Herrera* standard is inapplicable. *See, e.g., United States v. Dale,* 329 U.S.App. D.C. 335, 338, 140 F.3d 1054, 1056 (1998); *Carriger v. Stewart,* 132 F.3d 463, 478 (9th Cir.1997); *Burks v. Dubois,* 55 F.3d 712, 717 (1st Cir.1995); *Miller v. Comm'n of Correction,* 242 Conn. 745, 700 A.2d 1108, 1129 n. 28 (1997); *In re Elizondo,* 947 S.W.2d 202, 206 n. 1 (Tex.Crim.App. 1996).[3]

claims nor interpretation of the laws of the United States, was emphasized by the court's extensive quote from *Guinan v. United States,* 6 F.3d 468 (7th Cir.1993):

In [*Herrera v. Collins*] the Court held that a refusal to grant a new trial on the basis of newly discovered evidence is not actionable in habeas corpus. Section 2255 is a substitute for habeas corpus and like it is confined to correcting errors that vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude.... A defendant who seeks to have his conviction set aside on the ground of newly discovered evidence is claiming that the conviction was "erroneous" in the layman's sense—it reached the wrong result—but not that the trial judge committed reversible error. A judge can hardly be faulted for having failed to give due weight to evidence that had not been known to exist at the time the defendant was convicted and sentenced. The purpose of granting a new trial on the basis of newly discovered evidence is not to correct a legal error, but to rectify an injustice, and the office of section 2255 is the former, not the latter.... The conviction of an innocent person is an injustice, but it is only when such a conviction results from a legal error that the courts speak of a "miscarriage of justice" that warrants a new trial.... Even then, unless the

Second, when the majority acknowledges appellants' constitutional claims, it applies the rule in *M.A.P. v. Ryan* to preclude review under § 23–110 because this court was previously presented with and implicitly decided the same constitutional claims on direct appeal (albeit without the benefit of the new evidence supporting the claim of factual innocence). That outright refusal to consider the constitutional claims misses the point of habeas review under § 23–110. As we have already observed, application of the rule in *M.A.P.* to this context

> fails to comprehend the true nature of a collateral attack. One primary purpose of § 23–110 is to enable convicted prisoners to escape the shackles of *res judicata* when constitutional rights have been violated .... By its very definition, a collateral attack on a tainted sentence involves a challenge to the decision of the court that has previously adjudicated the issue. Despite this fact, § 23–110 requires the courts of the District of Columbia to be eternally vigilant in ensuring that prisoners are not subject to unlawful incarceration. For this reason we have necessarily held that strict principles of *res judicata* ... do not apply in these proceedings.

*Kirk v. United States*, 510 A.2d 499, 503–04 (D.C.1986).[4]

The view we expressed in *Kirk* echoes the Supreme Court, which "has consistently relied on the equitable nature of habeas corpus to preclude application of strict rules of res judicata." *Schlup, supra*, 513 U.S. at 319, 115 S.Ct. 851. The rule in *M.A.P.* is not jurisdictional; rather, it is an "internal policy" adopted by the court for the sake of good order at the time it became "the highest court for the District of Columbia, no longer

subject to review by the United States Court of Appeals." *M.A.P. v. Ryan, supra*, 285 A.2d at 312. The rule that one division's ruling binds a subsequent division, and may be reviewed only by the court en banc, is for the purpose of preserving uniformity among the various divisions of the court. This is a common rule in appellate courts that decide cases in divisions of less than the full court. Such an internal rule, however, cannot trump a right to judicial review created by statute, under § 23–110. Moreover, as with any internal policy, we have recognized that it might have to give way on occasion, where "we are bound to follow [a different rule] on federal constitutional grounds." *Id.*

The question before us is not *whether* the court has authority to consider this habeas petition, but *under what circumstances* it is appropriate for the court to do so, consistent with the competing values of institutional finality and the constitutional rights of the individual. Habeas relief is limited, but it exists to lend a further, attentive judicial ear to correct serious trial court error resulting in injustice. The majority's reasoning imposes a procedural straitjacket on the court that turns a deaf ear to habeas petitioners, no matter how serious the constitutional error or how compelling the claim that the jury's verdict was thereby misled about the petitioners' factual innocence, so long as final judgment was more than two years earlier or if the matter previously was considered by the appeals court. In my view, this narrow interpretation renders our habeas recourse under § 23–110 "inadequate" and "ineffective" when compared with the availability of habeas review in the federal courts. *Cf.* 28 U.S.C. § 2255 (1998) (permitting second and successive habeas petitions from federal con-

---

error is of constitutional magnitude, a federal court does not have the power to correct it in a proceeding brought under the habeas corpus statute (section 2254) or, we add today, its federal prisoner substitute (section 2255). *United States v. DeCarlo, supra*, 848 F.Supp. at 357 (quoting *Guinan, supra*, 6 F.3d at 470–71).

4. The majority criticizes my use of the quotation from *Kirk* because that case involved a supervening change in the law between this court's consideration of the first and second appeals. That is true here as well because the Supreme Court's opinion in *Schlup* established the standard that

must be met before a court may re consider an otherwise procedurally barred claim. *See* 513 U.S. at 327–28, 115 S.Ct. 851. *Schlup*, decided in 1995, came not only after *M.A.P.*, but after the direct appeals were decided by this court and between the time that this court affirmed the denial of Eastridge and Diamen's first § 23–110 motions in the mid 1980s and the denial of the § 23–110 motions presently before us on appeal. Therefore, this case comes within the exception we have already recognized in *Kirk* with respect to supervening changes in the law.

victions raising constitutional claims where there is evidence that "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the movant guilty of the offense"); *Schlup, supra,* 513 U.S. at 327–28, 115 S.Ct. 851 (defining standard for "fundamental miscarriage of justice exception" to avoid procedural bar to reconsideration by a federal court of the same constitutional claim previously considered and rejected by trial and appellate courts in state and federal court systems).

I venture that the majority's narrow interpretation of our habeas statute, if allowed to prevail, could subject us to unprecedented federal court habeas review under § 23–110(g).[5] *Cf. Triestman v. United States,* 124 F.3d 361, 380 (2d Cir.1997) (holding that where defendant is barred by newly amended § 2255 from presenting claim of actual innocence he could not have presented earlier, § 2255 relief is inadequate and ineffective and habeas corpus petition can therefore be brought under 28 U.S.C. § 2241(c)(3)). I am hopeful that this court will rehear these appeals *en banc* to fashion a rule that will permit, within strict but reasonable confines, the reconsideration of meritorious claims that a constitutional violation has led to the conviction of an innocent person. Although I write in dissent at this time, in the following pages I set out the standard, derived from the Supreme Court's opinion in *Schlup,* that I propose be adopted by the full court.[6]

### I.

Michael A. Diamen, Joseph Nick Sousa and Joseph Wayne Eastridge appeal from the trial court's denial, without a hearing, of their joint motion pursuant to D.C.Code

§ 23–110 to vacate their convictions of first-degree murder while armed, entered over twenty years ago, in a racially-motivated killing involving a motorcycle club, known as "the Pagans," to which they belonged. As part of their collateral attack, appellants also sought disclosure of grand jury testimony and discovery from the government. I reject the government's contention that appellants are necessarily barred from presenting their constitutional claims anew, after this court affirmed their convictions on direct appeal that raised similar concerns. I would hold that in view of the significant new evidence proffered by appellants, and its importance to their claims of constitutional trial error and actual innocence, this case appears to present special circumstances warranting review. I, therefore, would vacate the trial court's denial of the § 23–110 motion, remand for an evidentiary hearing consistent with the principles set out in this opinion and instruct the trial court to permit discovery, for purposes of that hearing, of grand jury testimony and other exculpatory material that may be in the possession of the government.

### II.

*The 1976 Murder Trial*

In 1976, a jury found appellants guilty of first-degree murder while armed for stabbing Johnnie Battle on November 1, 1974. The following version of the evidence produced at the trial is taken from this court's affirmance of appellants' convictions:

> On the evening of November 1, 1974, appellants [including Diamen, Sousa and Eastridge] and their companions (the "Richter group", as they were referred to repeatedly at trial) arrived at the Godfa-

---

5. Section 23–110(g) provides:

 *An application for a writ of habeas corpus* in behalf of a prisoner who is authorized to apply for relief by motion pursuant to [§ 23–110] *shall not be entertained* by the Superior Court or by any Federal or State court if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, *unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.* (Emphasis added.)

6. I note that the majority suggests that the *en banc* court may have authority to reconsider the constitutional claim that this division purportedly lacks under *M.A.P. v. Ryan.* See *ante* at 510. That argument, however, is in conflict with the majority's interpretation of Rule 33 as precluding any claim presenting new evidence that is beyond Rule 33's two-year window. If, as the majority holds, Rule 33 controls, even the *en banc* court would be precluded from considering a claim filed after the two-year window has closed.

ther Restaurant located in the 4900 block of Wisconsin Avenue, N.W., Washington, D.C. The Richter group arrived from Virginia in two cars and parked on Fessenden Street, a short distance from the restaurant. They entered the restaurant but were asked to leave by the doorman acting on instructions from the owner who was familiar with the Richter group. They started to leave. Jones, one of Richter's companions, picked up a large bag of popcorn and carried it from the restaurant. As they left the restaurant they encountered the decedent Johnnie Battle, Armon Allen, and Joseph Brown (the "Battle group"). Richter accused two members of the Battle group of insulting him, but both men denied the allegation. Both groups left the restaurant with the Richter group following the Battle group towards Fessenden Street. During this walk, the Richter group continued to taunt the Battle group. Allen, who became separated from the Battle group, was frightened, took a of [sic] metal comb from his pocket, and was pushed into Fessenden Street by a member of the Richter group. The push turned him around so that he was facing Richter who had a knife at his side. Two other members of the Richter group approached Allen, but Richter told them not to do anything and he ended the confrontation without further ado. Allen remained at the corner of Fessenden and Wisconsin, while appellants and their companions walked west on Fessenden. Meanwhile, Brown and Battle went to Battle's car where Battle armed himself with a pistol, started walking back towards Wisconsin Avenue, and there met the Richter group. Jones took the popcorn he was carrying and threw it at Battle while insulting him. Brown observed that persons in the Richter group were armed with knives. Battle drew his pistol and began firing. One shot hit Bruce Hunter, a member of the Richter group. Richter immediately left the scene to take Hunter to Arlington Hospital. Brown began running towards Wisconsin and Fessenden where he saw Allen. Before they both returned to the Godfather to seek refuge, they observed several members of the Richter group chasing Battle across Wisconsin Avenue into a small park. The doorman and owner of the Godfather also observed this chase. Another customer at the Godfather saw the chase, as did David Brady who was getting into his car on Wisconsin Avenue. When Battle reached Emery Street, he tripped, and his pursuers jumped him from two different directions and began beating and kicking him. The Godfather's owner was outside the restaurant and saw two cars with Virginia tags pass. The police arrived and spoke to the owner who pointed out one of the cars. The car then drove through a red light and the officer pursued. When the officer stopped the car it was occupied by Sousa, Diamen, Jones, and Eastridge. The owner identified the four as having been in the Godfather and as part of the group that was harassing Brown, Allen, and Battle. The men were ordered out of the car, and Diamen sat down on a small grassy area. A knife was found under the front seat of the car, and bloody newspapers were found under the back seat. *Knives were also found on Eastridge and Jones. Blood was found on Jones' clothing and boots, Diamen's pants, and Sousa's shirt.* In the meantime, the body of Johnnie Battle was discovered by four civilians. The appellants Sousa, Eastridge, and Diamen were arrested and charged with murder. Richter was arrested a few blocks from the Virginia hospital, and a knife was seized from his belt. The day after the murder, a witness discovered a knife in a pile of leaves near the grassy spot where Diamen waited while the car was being searched.

Appellants' trial lasted five weeks with the government presenting 36 witnesses and over 75 exhibits. All defendants charged with first-degree murder while armed admitted their presence at the Godfather and in its vicinity on the night of the murder, but denied participation in the murder. Richter's defense to the assault charges was self-defense.

Dorothy Willett testified that Sousa and Eastridge, while free on bond, met her on several occasions. Her testimony revealed that both Sousa and Eastridge admitted

their participation in the murder. She testified, in part:

Well, Nick [Sousa] said that it was a nigger that got Kenny and we got us one. And he said—I asked him at that time, I asked him, "Nick, you didn't really do anything like that, did you."

He said, "Not me, he did it." And he looked at Wayne [Eastridge].

And Wayne said to Nick, said, "You're the one that cut his nose off."

And Nick said, "well, yeah, I did that, but you sliced his ear."

She further testified that, in the same conversation, Sousa stated, "If it had not been for the one-way street, I would have gotten away."

*Sousa v. United States,* 400 A.2d 1036, 1038–40 (D.C.1979) (footnote omitted) (emphasis added).[7]

After the jury found appellants guilty of first-degree murder, Chief Judge Moultrie imposed upon each appellant a sentence of 20 years to life imprisonment.[8]

*The Direct Appeal*

This court affirmed the convictions, addressing "only those [contentions] pertaining to joinder and severance, and the sufficiency of the evidence as to appellant Richter." *Sousa, supra,* 400 A.2d at 1038.[9] Appellants' other arguments on appeal were rejected without discussion in a footnote noting that "[w]e have examined the multitude of other

contentions made by appellants and find them to be without merit." *Id.* at 1038 n. 1.

*Post-appeal Motions*

Subsequent to the affirmance of their convictions on direct appeal, appellants Eastridge and Diamen filed various motions collaterally attacking their convictions. In 1981, five years after his conviction, Eastridge filed a motion for a new trial alleging that ineffective assistance of trial counsel and newly-discovered evidence warranted a new trial. The new evidence consisted of an affidavit from a defense investigator who indicated that codefendant Jones had admitted his presence at the murder and claimed that Eastridge was not present. The trial court summarily denied the motion finding that such vague and conclusory allegations did not merit a hearing. This court affirmed the denial, quoting the trial court that "[n]owhere is there any firm indication—outside the mere assertion in the affidavit—that Jones would in fact recant the testimony he gave at the murder trial asserting his innocence and risk possible prosecution for perjury by doing so." *Eastridge v. United States,* No. 82–387, 5 (D.C. June 16, 1983). The court found it improbable that Jones' testimony at a new trial would produce a different result, because at the trial "Jones testified to his non-involvement in the murder; by convicting him, the jury declared that it found his testimony incredible. Appellant

7. During the second oral argument in this appeal, the government acknowledged that the blood and knives mentioned in this court's affirmance, and highlighted in the quotation in the text, did not link appellants to the murder of Johnnie Battle. Specifically, minuscule drops of blood on Sousa's shirt could not be identified. Similarly, a small amount of blood *inside* the leg of Diamen's pants was not traced to the murder victim. The knife found on Eastridge had no traces of blood even though it was recovered soon after he purportedly savagely attacked Johnnie Battle. Nor were there any eyewitnesses who identified any of the appellants as a principal in the attack on Battle. In sum, although the evidence at trial supported appellants' convictions as aiders and abettors, as the jury was permitted to find by the judge's instructions, the case presented by the government to the jury in 1976, that Diamen, Sousa and Eastridge were principals in the attack and murder of Johnnie Battle, was dramatically different

than what the physical and eyewitness evidence would appear to sustain.

8. At the time of briefing for this appeal, in 1996, Diamen and Sousa had served 19 years in prison and were on parole, while Eastridge remained incarcerated. Codefendant Jones served less than four years in prison for his participation in the murder.

9. Jones, a codefendant who also was found guilty of first-degree murder while armed, did not appeal his conviction. Richter, another codefendant, was found guilty of two counts of assault with a dangerous weapon and carrying a dangerous weapon. On direct appeal, this court reversed Richter's convictions after concluding that the trial court abused its discretion in failing to sever Richter's trial and that the evidence was insufficient to sustain one of the assault counts. *Sousa, supra,* 400 A.2d at 1038.

[Eastridge] presents no convincing indication that Jones' credibility will improve." *Id.*

In 1983, Diamen filed a motion to vacate judgment and sentence pursuant to D.C.Code § 23–110, raising, among other issues, ineffective assistance of counsel and newly-discovered evidence. The trial court denied the motion without a hearing and this court affirmed the denial, concluding that his claims were meritless or, in the case of the proffered new evidence, because it was presented after the two-year period provided by Super. Ct.Crim. R. 33 for new trial motions based on new evidence. *Diamen v. United States,* No. 84–1358, 2–3 (D.C. July 31, 1985).

Until the current collateral attack that is the subject of this appeal, Sousa had not collaterally attacked his conviction.

*The Current § 23–110 Motion*

The subject of this appeal is a joint motion filed in April 1995 by Eastridge, Diamen and Sousa to vacate their convictions pursuant to D.C.Code § 23–110, which included a request for an evidentiary hearing. As in their direct appeals, they argued that the trial court's rule prohibiting them from eliciting from any witness or codefendant any testimony that might inculpate or exculpate a codefendant, without the permission of all codefendants, violated appellants' Fifth and Sixth Amendment rights. In addition, they argued that the newly-discovered evidence presented in their motion not only underscores the unconstitutionality and prejudice resulting from the trial court's limitations on examination, warranting vacation of their conviction under § 23–110, but that relief also was warranted under § 23–110 based on the "actual innocence" standard set out in *Herrera, supra.*[10] Appellants also filed a motion for disclosure of grand jury testimony and other discovery.

Both motions were summarily denied in a written order.

Because of its importance to appellants' arguments on appeal, the evidence presented to the trial court in support of their § 23–110 motion is set forth in detail. The new evidence came to light as a result of a six-year investigation begun in 1987 by Centurion Ministries.[11] As a result of the Ministries' investigation, appellants presented affidavits with exculpatory information not previously presented to the trial court: 1) an affidavit signed in 1994 by Stephen Jones, a codefendant in the murder trial; 2) affidavits by Michael Grayson, Raymond Thomas Lurz and Richard Richter, three other members of the Pagans motorcycle club involved in the confrontation with the murder victim; 3) an affidavit by John Gianaris, a heretofore unknown eyewitness to the murder, who was not associated with the Pagans; and 4) eleven affidavits from individuals who attacked the testimony and reputation for truthfulness and character of Dorothy Willetts, a key government witness at the murder trial.

In his affidavit, Jones states that appellants "did not play any role in the murder of Johnnie Battle." Jones recants the portion of his trial testimony where he testified that he chased Battle but did not catch him and that he was neither involved in the killing nor did he see who killed Battle. Jones now contends that he was present during the murder as were fellow Pagan members Charles Jennings, John Woods, and one other individual whom he will not name at the present time. Jones states that none of the appellants was present.

Jones claims in his affidavit that he chased Battle through a small park across from the Godfather Restaurant up Emery Street and

10. *Herrera* assumed, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional ...." 506 U.S. at 417, 113 S.Ct. 853. Out of a concern for finality and the burden that would be placed on states to retry cases based on stale evidence, the threshold for a showing of actual innocence by a convicted defendant sufficient to constitute, without more, a constitutional deprivation is "extraordinarily high." *Id.*

11. According to a 1995 affidavit by its president and founder, Reverend James McCloskey, Centurion Ministries is a nonprofit advocacy center that works, without charge, to assist individuals who claim to have been wrongfully convicted and are facing life sentences or the death penalty. According to the affidavit, since 1983 Centurion Ministries have used their resources in an attempt to vindicate thirty-four convicted persons in thirty different cases; as of 1995 fifteen convicted persons had been freed as a result of their efforts, after having served considerable portions of their sentences.

into an alley. They exited the alley and crossed Ellicott Street where Jones tackled Battle in a parking lot. Jones started punching Battle and was soon joined by Jennings, who began to stab Battle with a buck knife, and Woods, who held Battle down; the unidentified individual, stabbed Battle with a bowie knife. Jones claims that he backed away once the stabbing began, but not quickly enough to avoid a cut on his right hand. After the stabbing, the four ran down the alley between Ellicott and Emery Streets. Jones ran up Emery away from Wisconsin Avenue and saw appellants' car coming up Emery Street. This was the first time he had seen appellants since he began chasing Battle. He got into the car and told appellants to "get the hell out of here," but did not mention the murder. Jones stated that Eastridge gave him a newspaper for his bloody hand. Sousa, the driver, continued up Emery Street, turned left onto 41st Street and another left turn onto Fessenden Street, which led back to Wisconsin Avenue. They turned right onto Wisconsin Avenue where they were soon pulled over by the police.

Jones contends in his affidavit that he did not come forward with this information earlier and instead committed perjury at trial because he, like Jennings, Woods, the unidentified individual and appellants were members of the Pagan motorcycle club and, as such, abide by the Pagan Code. Part of the code dealt with the police and, according to Jones, provided that

> no Pagan was ever to turn another Pagan in to the police for any reason, even if another Pagan had been arrested falsely for the same crime. The reason for this rule was that the Pagans felt persecuted by the police and believed that, if one Pagan were falsely arrested, and another Pagan was turned in as the true perpetrator, the police and the government would simply try to prosecute both of them.

According to Jones, therefore, under the Pagan Code, he could not implicate Jennings, Woods and the unnamed individual, even if it meant implicating appellants, because they

were all Pagans. In addition, Jones claims that he was better friends with Jennings, Woods and the unnamed person than with Eastridge, Sousa and Diamen, whom he hardly knew. Furthermore, he was afraid of facing perjury charges and thought that he could be recharged and face a new trial for the murder.

John Gianaris, who states that he was hiding in the alley during the murder, corroborates Jones' affidavit with respect to the number of assailants. Gianaris states in his affidavit [12] that on the night of the murder he was behind a chain link fence that bordered the alley and Ellicott Street. From behind the fence he saw a black man being chased by "[no] more than four" white men. After the white men attacked the black man in the parking lot, the attackers ran away. Additionally, at no point during the attack did Gianaris see a car pull up along Ellicott Street. Gianaris is not connected to the Pagans or to the appellants.

Michael Grayson, a member of the Pagans in the 1970s, states in his 1992 affidavit that in 1979, three years after appellants' trial, Woods (one of the Pagans implicated in the murder by Jones' affidavit) told him that appellants had nothing to do with the murder and that Battle was instead killed by Woods and three other Pagan members: Charles Jennings, Chesley Barber and Steven Jones. Woods explained that Jones had chased and tackled Battle, but had told a different story at trial. Another former Pagan member, Raymond Thomas Lurz, states in his 1993 affidavit that in 1977, one year after the trial, Woods told him that Eastridge, Sousa and Diamen were wrongfully convicted. One year later, in 1978, Woods again indicated to Lurz that appellants did not commit the murder and that he (Woods) along with Jennings, Jones and one other person chased and murdered Battle. A third former Pagan member and codefendant in the 1976 trial, Richard Richter, whose convictions were reversed on direct appeal, states in his 1995 affidavit that before and after the trial he learned that appellants were not involved in the murder

---

**12.** Gianaris' original 1992 affidavit was replaced in 1995 with a notarized copy of the same affidavit.

and that Jones, Jennings, Woods and a fourth man participated in the murder. He also had conversations with Woods and Jennings in which they expressed remorse for appellants' wrongful convictions. According to Richter, in 1974 Jennings told him that he, Jennings, had thrown his buck knife down a sewer and fled the scene.

Appellants also offered ten other affidavits taken by Centurion Ministries from individuals who refute the testimony of Dorothy Willetts, a key government witness who testified that Eastridge and Sousa made incriminating statements to her.[13] The affidavits also attack Willetts' reputation for truthfulness and her character.[14]

The trial court denied appellants' motion for a new trial on two grounds: (1) that Superior Court Criminal Rule 33's two-year time limitation on motions for new trial based on newly-discovered evidence precluded relief,[15] and (2) that appellants could not prevail under D.C.Code § 23–110.[16] The trial court ruled that it need not hold an evidentiary hearing because appellants had failed to state a factual claim requiring a hearing under § 23–110.

Even assuming the motion was not time-barred, the trial court concluded that appellants' § 23–110 motion should be denied. Specifically, the trial court found that Jones' affidavit was not a recent recantation of his trial testimony and that this court had previously "considered this recantation, albeit not in affidavit form, and rejected its legal significance." The court relied on the trial court's findings in 1983, when it denied Eastridge's first § 23–110 motion, that Jones' recantation was incredible, and on this court's affirmance of that finding. Furthermore, the trial court noted that Jones' membership in the Pagans evidenced his potential bias and further discredited his affidavit because the only Pagan members Jones expressly implicates in the murder, Woods and Jennings, are deceased. The trial court questioned the credibility of the affidavits of Grayson, Lurz and Richter in part because they are all former Pagans. Even if appellants could meet the credibility threshold, the trial court indicated, the information in the affidavits was inadmissible hearsay. The trial court found Gianaris's affidavit incredible because Gianaris did not come forward sooner and his statements were too vague. The trial court considered that the affidavits offered to impeach Wil-

13. See Willetts' testimony page 519, *supra*. In addition to her trial testimony, Willetts' statement to the police in 1975 specified various occasions when Eastridge and Sousa were alleged to have made incriminating statements. The affiants are individuals Willetts claimed were present when the various incriminating statements were made and all contend that they did not hear any incriminating statements.

14. Two affidavits allege that Willetts had a poor reputation for truthfulness and was known in 1975 for being a liar. Four affidavits attack Willetts' character.

15. Super. Ct.Crim. R. 33 provides:

The Court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment ....

Appellants' § 23–110 motion was filed on April 7, 1995, nineteen years after final judgment by the trial court.

16. Section 23–110 provides in part:

(a) A prisoner in custody under sentence of the Superior Court claiming the right to be re-

leased upon the ground that (1) the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia, ... (4) the sentence is otherwise subject to collateral attack, may move the court to vacate, set aside, or correct the sentence.

(b) A motion for such relief may be made at any time.

(c) Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues, and make .findings of fact and conclusions of law with respect thereto. If the court finds that ... (2) the sentence imposed was not authorized by law or is otherwise open to collateral attack, (3) there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner, resentence him, grant a new trial, or correct the sentence, as may appear appropriate.

....

(e) The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

letts's trial testimony were weak and, the trial court noted, the affiants were available prior to trial.

Furthermore, the trial court ruled that appellants' new evidence was not sufficient to warrant relief under § 23–110 because it did not convince the trial court of appellants' actual innocence. Appellants alleged that the blood evidence presented at trial did not link them to the murder because none of them had any of Battle's blood on them. The government presented evidence that Sousa and Diamen had a small amount of unidentified blood on their clothing and that there were bloody newspapers in the car. The trial court reasoned that the absence of blood on their persons traceable to the murder victim was not conclusive evidence of actual innocence and did not warrant a new trial. In evaluating appellants' claims of actual innocence, the trial court did not take into account the new affidavits because, according to the trial court, the evidence did not meet the rigorous standard of actual innocence set forth by the Supreme Court in *Herrera.*

The trial court entertained Sousa's claim of ineffective assistance of trial counsel acknowledging that it was his first § 23–110 motion. The court concluded that appellants'[17] claims failed both prongs of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in that they failed to show that their respective counsel were deficient and failed to show how any deficient performance prejudiced their cases.

The trial court refused the request for an evidentiary hearing on appellants' § 23–110 motion on the grounds that appellants' proffered affidavits were "incredible," "vague" and "conclusory ." Even if the affidavits were believed, the trial court concluded, they would not entitle appellants to a new trial or raise factual questions requiring a hearing.

D.C.Code § 23–110 (1996).

**17.** The trial court entertained Eastridge's and Diamen's ineffective assistance of counsel claims along with Sousa's, noting that it was obligated to entertain Sousa's claims.

**18.** The government also argues that Eastridge's and Diamen's claims are procedurally barred under § 23–110(e) which provides that "[t]he court shall not be required to entertain a second

*See Ready v. United States,* 620 A.2d 233, 234 (D.C.1993).

## III.

On appeal, Diamen, Sousa and Eastridge contend that the trial court erred in denying their § 23–110 motion, arguing that they are entitled to relief pursuant to § 23–110(a)(1) because their sentences were imposed in violation of the Constitution, and pursuant to § 23–110(a)(4) because their sentences are otherwise open to collateral attack. In addition, appellants contend that the trial court should have held a hearing on their § 23–110 motion and granted their request for discovery.

*"Special Circumstances" Warranting Review*

Before we can address appellants' contentions on the merits, we must determine first whether this court's previous decision in the direct appeal precludes further reconsideration. In *Sousa, supra,* this court already rejected the appellants' core constitutional claim in their collateral attack, their challenge to the court's restriction on cross-examination, in a one-sentence footnote, stating that "[w]e have examined the multitude of other contentions made by appellants and find them to be without merit." 400 A.2d at 1038 n. 1. The government argues that we are precluded from considering the current appeal because "where an appellate court has disposed of an issue on appeal, it will not be considered afresh on a collateral attack in a trial court of the same judicial system, absent special circumstances." *Doepel v. United States,* 510 A.2d 1044, 1045–46 (D.C.1986). The government argues that affirmance of the direct appeal in 1979 forecloses further review by this court and that any further review would be in derogation of *M.A.P., supra.*[18]

or successive motion for similar relief on behalf of the same prisoner." *See Peoples v. Roach,* 669 A.2d 700, 702 (D.C.1995); *Mayfield v. United States,* 659 A.2d 1249, 1253 (D.C.1995), *cert. denied,* 518 U.S. 1026, 116 S.Ct. 2566, 135 L.Ed.2d 1083 (1996). After acknowledging this potential bar, the trial court nonetheless recognized that Eastridge's and Diamen's claims were identical to those of Sousa—who had not previously filed a § 23–110 motion. Because it had to address Sousa's claims, the trial court applied

Appellants concede that the unconstitutionality of the trial court's restriction on cross-examination was raised on direct appeal, but argue that this court may consider their claim because this case presents the kind of "special circumstances" reserved under *Doepel, supra.* According to appellants, the special circumstances warranting reconsideration in this case include; (1) the constitutional importance of the issue, (2) the significance to the constitutional issue of new evidence not considered by the trial court or by this court on direct appeal, (3) the claimed actual innocence of the appellants, and (4) that the issue was not expressly addressed by this court in the opinion issued in the direct appeal.

Analysis of § 23–110 must begin with the statutory language, which expressly provides that a motion "may be made at any time." D.C.Code § 23–110(b). We also must recognize that the equitable nature of habeas corpus "preclude[s] application of strict rules of res judicata." *Schlup, supra* at 319, 115 S.Ct. 851.[19] Thus, in *Doepel*, where we considered an appeal from an order denying a § 23–110 motion which raised issues that already had been presented and decided on direct appeal, we declined to revisit the issue absent "special circumstances." *Doepel, supra,* 510 A.2d at 1045–46. In denying the appeal, we stated that no further review was necessary, expressing confidence that when the prior appellate opinion concluded that the evidence was sufficient to support the first-degree murder conviction, we had of necessity fully considered and rejected the precise issue raised in the subsequent new trial motion, whether there was sufficient evidence of the required elements of deliberation and premeditation in light of Doepel's intoxication and of forcible intercourse. *See id.* at 1047–48. Although *Doepel* did not define the "special circumstances" that would permit renewed appellate review, in *Peoples, supra* note 18, we indicated that "special circumstances might consist of an intervening

the same analysis to Diamen's and Eastridge's motions. As the trial court did address the merits of Eastridge's and Diamen's motions, § 23–110(e) is inapplicable.

19. The scope of § 23–110 is "commensurate with habeas corpus relief." *Swain v. Pressley,* 430

change in the relevant law." *Id.* at 702 n. 5. (citing *Davis v. United States,* 417 U.S. 333, 342, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974)).

The proposition in *Doepel* and *Peoples* that a collateral attack may lie in certain limited circumstances even with respect to a claim already decided on direct appeal finds support in federal case law construing 28 U.S.C. § 2255.[20] In denying a federal prisoner's habeas petition under § 2255, the court in *United States v. Palumbo,* 608 F.2d 529, 533 (3d Cir.1979), held that

in the absence of newly discovered evidence that could not reasonably have been presented at the original trial, a change in applicable law, incompetent prior representation by counsel, or other circumstances indicating that an accused did not receive full and fair consideration of his federal constitutional and statutory claims, a § 2255 petitioner may not relitigate issues that were adjudicated at his original trial and on direct appeal.

(internal footnotes omitted); *see also Davis, supra,* 417 U.S. at 342, 94 S.Ct. 2298 (intervening change in the law); *English v. United States,* 998 F.2d 609, 613 (8th Cir.1993) (intervening change in the law or newly-discovered evidence); *Morgan v. United States,* 438 F.2d 291, 292–93 (5th Cir.1971) (newly-discovered evidence).

Also instructive is case law interpreting the availability of federal habeas relief from state convictions. As the Supreme Court summarized in *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992):

Unless a habeas petitioner shows cause and prejudice, *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), a court may not reach the merits of: (a) *successive claims* that raise grounds identical to grounds heard and decided on the merits in a previous petition, *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); (b) new

U.S. 372, 384, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977).

20. As § 2255 is "nearly identical and functionally equivalent" to D.C.Code § 23–110, we rely on federal cases for guidance. *See Butler v. United States,* 388 A.2d 883, 886 n. 5 (D.C.1978).

claims, not previously raised, which constitute an abuse of the writ, *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); or (c) *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules in raising the claims, *Murray v. Carrier*, 477 U.S. 478 [106 S.Ct. 2639, 91 L.Ed.2d 397] (1986). These cases are premised on our concerns for the finality of state judgments of conviction and the "significant costs of federal habeas review." *McCleskey, supra*, at 490–491, 111 S.Ct. 1454; *see, e.g., Engle v. Isaac*, 456 U.S. 107, 126–128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

*Id.* at 338, 112 S.Ct. 2514. The limitation on successive, abusive or defaulted claims is subject, however, to a narrow "fundamental miscarriage of justice" exception that allows consideration of otherwise barred constitutional claims if they are coupled with a claim of actual innocence. *See id.* at 339, 112 S.Ct. 2514; *Kuhlmann, supra*, 477 U.S. at 452, 106 S.Ct. 2616; *Murray, supra*, 477 U.S. at 496, 106 S.Ct. 2639; *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).[21]

In *Sawyer*, the Court established the evidentiary standard required to meet this exception as requiring the petitioner to show "by clear and convincing evidence that, but for constitutional error, no reasonable juror" would have convicted the defendant, or, as in that case, sentenced the petitioner to death. *See* 505 U.S. at 336, 112 S.Ct. 2514. More recently, in *Schlup, supra*, recognizing that habeas corpus is an equitable inquiry that provides a remedy when required by the "ends of justice," *see* 513 U.S. at 319, 115 S.Ct. 851 (quoting *Sanders v. United States*, 373 U.S. 1, 15–17, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963)), the Court relaxed the *Sawyer* test for avoiding a procedural bar to a previously considered constitutional claim when it is augmented by a claim of actual innocence.[22] Balancing the state's interest in

**21.** Unlike *Sawyer, Kuhlmann, Murray, Schlup* and other Supreme Court cases defining the fundamental miscarriage of justice exception to successive, abusive or procedurally barred claims, in *Herrera* there was no claim of constitutional error by the state courts. *See* 506 U.S. at 398, 113 S.Ct. 853. The *Herrera* Court refused to hear, because it considered it to be insufficient, petitioner's claim that conviction and imposition of the death sentence in the face of his actual innocence, without more, constituted a constitutional violation. The court did not foreclose the possibility that a more compelling free-standing claim of actual innocence arising from an error-free trial would suffice to entitle a state petitioner to federal habeas relief. *See* 506 U.S. at 404–05, 113 S.Ct. 853. In *Schlup*, the Court made clear that in a habeas petition claiming a constitutional violation, the conviction "may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial." 513 U.S. at 316, 115 S.Ct. 851. Thus, "evidence of innocence need carry less of a burden" in a petition claiming a constitutional violation than in *Herrera*. *Id.*

**22.** The procedural history of Schlup's constitutional claim is similar to that of appellants, except that in Schlup's case *twice* before the federal appellate court had already considered his constitutional claim of ineffective assistance of counsel—and denied it—before the Supreme Court established the standard for reconsidering the claim in a second round of federal habeas review when the same constitutional claim was augmented by a claim of actual innocence. Specifically, after being affirmed on direct appeal by the Missouri appeals and Supreme courts, Schlup's murder conviction was subjected to state collateral attacks, which were fully exhausted, including affirmance by the Missouri Supreme Court. *See Schlup, supra*, 513 U.S. at 306 nn. 13 & 15, 115 S.Ct. 851. In his first *pro se* habeas petition filed in federal court, Schlup again raised a constitutional claim of ineffective assistance of counsel, namely that counsel had failed to investigate and call witnesses who could establish Schlup's innocence. *See id.* at 306 n. 14, 115 S.Ct. 851. After the District Court denied the petition as being procedurally barred, the Court of Appeals for the Eighth Circuit affirmed, not on procedural grounds, but expressly deciding the merits after reviewing the record, and concluded that trial counsel's performance had not been ineffective because counsel had reviewed statements from potential witnesses and not prejudicial because their testimony would have been cumulative in any event. *See id.* at 307, 115 S.Ct. 851. The Eighth Circuit denied rehearing and rehearing en banc, and the Supreme Court denied certiorari. *See id.*

Represented by counsel, Schlup filed a second habeas petition in the federal court, again asserting trial counsel's ineffectiveness in failing to interview and present defense witnesses. This time, however, the constitutional claim was accompanied by a claim of actual innocence, supported by several affidavits from inmates who stated that Schlup had not been involved in the killing of which he was convicted. The District Court denied the petition, stating that it was too late and, applying the *Sawyer* standard, failed to

finality and judicial economy against the individual's interest in relitigating constitutional claims previously held meritless, the Court established that in order to avoid a procedural bar by coming within the "fundamental miscarriage of justice" exception, a petitioner is required to show that "a constitutional violation probably resulted in the conviction of one who is actually innocent." *Id.* at 327, 115 S.Ct. 851 (quoting *Carrier, supra,* 477 U.S. at 496, 106 S.Ct. 2639). The "requisite probability" is met by a showing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup, supra,* 513 U.S. at 327, 115 S.Ct. 851. This is a stronger showing than required to meet the prejudice prong under *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (requiring a reasonable probability), but less than the "clear and convincing" standard that had originally been required by the Court in *Sawyer, supra.* *See Schlup, supra,* 513 U.S. at 327, 115 S.Ct. 851. The standard is intended to be high enough to "ensure[ ] that petitioner's claim is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey, supra,* 499 U.S. at 494, 111 S.Ct. 1454).[23]

We have the same interest as the federal courts in the finality of judgments and the conservation of judicial resources. *See Doepel, supra,* 510 A.2d at 1045; *Head v. United States,* 489 A.2d 450, 451 (D.C.1985) (requiring a showing of cause and prejudice before a collateral attack will be considered where defendant has failed to raise available challenge on direct appeal). We do not, however, within a unitary court system, have the federalism concerns that cabin the scope of the federal courts' consideration of state claims.

make a sufficient showing that "a refusal to entertain those claims would result in a miscarriage of justice." *Id.* at 309, 115 S.Ct. 851. On Schlup's second appeal from the denial of a habeas petition, the Eighth Circuit, after discussing at length the proffered new evidence, again denied the petition on the merits. The appellate court decided that the new evidence was insufficiently persuasive to permit retrial; one judge dissented, concluding that the affidavits "?resented truly persuasive evidence that [Schlup] is actually innocent,' and that the District court therefore should have addressed the merits of Schlup's constitutional claims." *Id.* at 312, 115 S.Ct. 851. After the Eighth Circuit again affirmed after rehearing the case *en banc,* the Supreme Court granted certiorari to determine whether the *Sawyer* standard was applicable to habeas petitions in which a constitutional claim is accompanied by a claim of actual innocence. As discussed in the text, the Court concluded that a lesser "more likely than not" standard was applicable to claims of actual innocence presented in this context, and remanded the case to the district court to determine whether Schlup's new evidence met the gateway standard and, if so, to reconsider his ineffective assistance of counsel claim.

**23.** In 1996, after the Court's opinion in *Schlup,* Congress enacted Title I of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1217, 1220, 28 U.S.C. §§ 2244 and 2255, which substantially changed the federal courts' authority to grant habeas relief from state and federal convictions. The amendments restrict the federal courts' authority to consider habeas relief by imposing a one-year limitation on the filing of first habeas petitions, precluding consideration of second or successive habeas petitions from state-convicted prisoners based on previously considered claims and requiring appeals court certification before a district court may consider second habeas petitions based on new claims or successive petitions. In the case of second or successive motions, the standard for federal appellate court certification under both §§ 2244 (state convictions) and 2255 (federal convictions) is 1) the *Sawyer* standard whether there is evidence that "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the movant guilty of the offense," or 2) whether there is "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255 (1998).

In *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), the Court interpreted the restrictive amendments as applying only to rulings of lower federal courts without, however, precluding at all habeas petitions filed as original matters with the Supreme Court under 28 U.S.C. §§ 2241 (state convictions) and 2254 (federal convictions). *Id.* at 660–61, 116 S.Ct. 2333. Therefore, even though the amendments cut off Supreme Court review of appeals court denials of required certifications for second or successive habeas petitions, the restrictions do not infringe on the Supreme Court's appellate jurisdiction granted by Article III, § 2, *id.* at 662, 116 S.Ct. 2333, nor suspend the writ of habeas corpus in violation of Article I, § 9 of the Constitution, *id.* at 663, 116 S.Ct. 2333. Rather enigmatically, the Court stated that "[w]hether or not we are bound by these restrictions, they certainly inform our consideration of original habeas petitions ." *Id.*

We also do not, unlike the federal courts, have legislative restrictions on our authority to hear or rehear habeas petitions. *Compare* 28 U.S.C. §§ 2244(b) and 2255 (1998) (imposing limitations on consideration of initial, second and successive habeas petitions, see *supra* note 23), *with* D.C.Code § 23–110(e) ("The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner."). Although we are not confronted with the "quintessential miscarriage of justice," execution of one who is innocent, *see Schlup, supra,* 513 U.S. at 324, 115 S.Ct. 851, appellants come before us convicted of the most serious offense in our jurisdiction, first-degree murder, and in a particularly heinous racial context. *Cf. Burks, supra,* 55 F.3d at 717, (applying *Schlup* standard to non-capital case); *Cornell v. Nix,* 119 F.3d 1329, 1334 (8th Cir.1997) (applying *Herrera* standard to non-capital case). Finally, in light of the limitation on federal review of judgments of conviction of prisoners sentenced by Superior Court unless § 23–110 relief is deemed to be "inadequate or ineffective," *see* D.C.Code § 23–110(g) (1996),[24] we should construe the scope of collateral relief in our courts to be "adequate and effective," that is, at a minimum coextensive with the right to habeas relief in the federal courts. *See Swain v. Pressley,* 430 U.S. 372, 384, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977); *Garris v. Lindsay,* 254 U.S.App. D.C. 13, 18, 794 F.2d 722, 727 (1986); *Perkins, supra* note 24, 881 F.Supp. at 59.

Recognizing the concerns that underlie restrictions on collateral attacks, yet cognizant also of the need to maintain § 23–110 relief available as a procedural vehicle for the very purpose of "enabl[ing] convicted prisoners to escape the shackles of *res judicata* when constitutional rights have been violated," *Kirk, supra,* 510 A.2d at 503, I would hold that the standard enunciated by the Supreme Court in *Schlup* constitutes "special circumstances" under *Doepel* sufficient to permit a

collateral attack under our law even if the collateral attack is premised on an issue previously raised before—and decided by—this court.[25] The record before us supports, as a threshold matter, that appellants' case presents a *prima facie* case of "special circumstances" as thus defined: a claim of serious constitutional error, supplemented by a compelling claim of actual innocence. Both claims are supported by the presentation of new exculpatory evidence which, if believed, shows it is at least "more likely than not that no reasonable juror would have convicted" Diamen, Sousa and Eastridge of first-degree murder. *See Schlup, supra,* 513 U.S. at 327, 115 S.Ct. 851.[26] Thus, if appellants meet their burden, they would come within the narrow "special circumstances" window recognized in *Doepel* so that the constitutional claims in their current § 23–110 motion should be addressed even though they already were considered and decided on direct appeal. The issue is not to be decided by us at this juncture; it is a matter to be addressed by the trial court in the first instance after an evidentiary hearing which, for the reasons described in the following section, is necessary for a proper evaluation of the probative value of the newly proffered evidence, in the context of the government's overall case at trial.

*Availability of § 23–110 Relief*

The *Schlup* standard adopted herein by definition subsumes the standard that must be met under § 23–110 where the collateral attack, as here, is premised on a "violation of the Constitution." D.C.Code § 23–110(a)(1); *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that constitutional violation is subject to test of constitutional harmlessness, *i.e.,* whether violation is harmless beyond a reasonable doubt); *Artis v. United States,* 505 A.2d 52, 55 (D.C.1986) ("Curtailment of constitutionally-protected cross-examination constitutes harmless constitutional error where it is

---

**24.** Similar limitations apply to habeas petitions challenging confinement. *See* D.C.Code § 16–1901; *Perkins v. Henderson,* 881 F.Supp. 55, 59 (D.C.Cir.1985)

**25.** I do not intend to imply that this is the only standard that will constitute "special circum-

stances" under *Doepel. See, e.g., Peoples, supra,* 669 A.2d at 702 n. 5 (intervening change in law).

**26.** There is no need to decide at this point whether the proffers, if credible, would meet the *Sawyer* test, now adopted in 28 U.S.C. §§ 2244 and 2255, of clear and convincing evidence.

clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony or (2) that the restricted line of inquiry would have weakened the impact of the witness' testimony.") (quoting *Springer v. United States*, 388 A.2d 846, 856 (D.C.1978)). Therefore, if appellants come within the higher standard for the "miscarriage of justice" exception, they are *a fortiori* entitled to a new trial under § 23–110(a)(1).

The substance of appellants' constitutional claims is that the trial court's restriction on cross-examination violated their Fifth Amendment due process right to introduce evidence of their innocence by implicating third parties, namely their codefendants, infringed their Sixth Amendment right to confront and cross-examine witnesses, and breached their right to effective assistance of counsel. The trial transcript is full of examples demonstrating the severe impact of the trial court's ruling [27] Indeed, in denying appellant Eastridge's first § 23–110 motion alleging ineffective assistance of counsel, the trial court concluded that counsel was not ineffective due in part to "the court's severe restriction regarding cross-examination at the trial." *See Strickland, supra,* 466 U.S. at 686, 104 S.Ct. 2052.

A defendant in a criminal trial has a constitutional right to present relevant evidence that another person was the perpetrator of the offense. *See Gethers v. United States,* 684 A.2d 1266, 1271 (D.C.1996); *Winfield v. United States,* 676 A.2d 1, 4–5 (D.C.1996) (en banc); *Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989). With respect to the claimed violation of the right to confrontation, the trial court's limitation on cross-examination, the Court has held that where a line of questioning relating to a witness' bias has been completely foreclosed, the constitutional right to confront witnesses is violated because there has not been a "meaningful" opportunity to cross-examine a witness. *See*

*Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Stack v. United States,* 519 A.2d 147, 151 (D.C. 1986); *Lawrence v. United States,* 482 A.2d 374, 377 (D.C.1984). In *Jenkins v. United States,* 617 A.2d 529 (D.C.1992), we concluded that even partly foreclosing inquiry into the nature of a witness' bias rose to a constitutional violation. *See id.* at 533. Here, the complete prohibition during trial on any unconsented questioning that might incriminate a codefendant hampered cross-examination into bias and undermined appellants' ability to present a defense to a degree that clearly implicates the Fifth and Sixth Amendments.

Against this background, the newly-discovered evidence—which for purposes of this discussion is assumed to be credible—takes on added significance because it relates to and aids in the evaluation of appellants' constitutional claim. First, it confirms that the trial court's restriction on cross-examination was of a constitutional dimension. Jones, a codefendant in the murder trial, now recants the part of his trial testimony where he stated he chased Battle but did not catch him. In a sworn affidavit, Jones admits to chasing, catching and beating Battle and being at the scene when Jennings, Woods and another individual started stabbing Battle. Jones now states that appellants were not present at the scene and that they did not have any knowledge of the stabbing. Under the trial court's ruling restricting cross-examination, however, Jones' new statements could not have been elicited on cross-examination because they would have inculpated Jones. Given the opportunity, appellants' trial counsel could have cross-examined Jones on any number of fronts; his and others' involvement in the chase, the reason why he had blood on his person from the murder victim (while appellants did not) and how he came to be in appellants' car. In addition, absent the restriction on cross-

---

**27.** Counsel for Sousa attempted to cross-examine Pamela Heim, a key government witness, regarding the number and names of the individuals she saw chasing Battle. On direct examination, Heim testified that she did not see the chase; she had stated to the grand jury, however, that she saw Jones, among others, excluding appellants, chasing Battle. This line of inquiry was foreclos-

ed by the trial court's ruling because it would have implicated Jones. Sousa's counsel also was prohibited from cross-examining Heim regarding alleged conversations she had or overheard because the information would inculpate a codefendant (Jones), even though the information also would have exonerated appellants. See also note 28, *infra.*

examination, key government witnesses could have been more fully cross-examined about their knowledge of the stabbing.[28] The restriction on cross-examination inhibited appellants from developing a defense by presenting evidence that someone else committed the murder, a theory that Jones' affidavit supports.[29] *See Winfield, supra,* 676 A.2d at 4–5.

The affidavits of Richter, Lurz and Grayson contain information that arose after the trial which, if believed, corroborates Jones' affidavit and similarly exculpates appellants. The affidavit of Gianaris corroborates Richter's and Jones' affidavits and adds support to appellants' theory that they were not in the group of individuals chasing Battle. The affidavits attacking the credibility of a key government witness undermine the strength of the government's case at trial. Thus, appellants' substantial constitutional claim, as supported by the new evidence, is appropriate for relief under § 23–110(a)(1).[30]

**28.** At trial, Sousa's counsel expressed concern that he was unable to present Sousa's defense properly without a more indepth cross-examination of Dorothy Willetts, a key government witness:

> Counsel: I am unable to cross examine these witnesses to clarify and show exculpatory information as it relates to my client.... I am confounded by reason of the fact that I cannot lay out the full fabric of the situation to the jury; not because it does not exist, not because there is not evidence to show that it does exist, but simply and completely because another defendant stands in the way of my client laying out these facts. And that utterly confuses me in the presentation of his defense, Your Honor.

At a later point in the trial, Sousa's counsel wanted to cross-examine another government witness, Pamela Heim, regarding any blood she saw on the codefendants:

> Counsel: Did I understand Your Honor's ruling that I cannot in the course of cross-examination deal with the subject of blood as it was shown on another person other than my client?
> The Court: That's right.

**29.** The following exchange between Sousa's counsel and the trial court discussing whether Sousa's counsel could elicit certain information from a government witness which would inculpate certain codefendants illustrates counsel's concern regarding his inability to present a coherent defense theory:

> Counsel: This transcript, in several instances, points the finger elsewhere other than at my client. And I believe that a good defense in the case for my client, Mr. Sousa, or for any

## IV.

### Hearing on Remand

On remand, at a hearing on the proffered evidence the trial court is to be focused on the actual innocence of the appellants in order to determine whether the proffer made in the form of affidavits brings them within the gateway "miscarriage of justice" exception. "In assessing the adequacy of the petitioner's showing, therefore, the [trial] court is not bound by the rules of admissibility that would govern at trial." *Schlup, supra,* 513 U.S. at 327, 115 S.Ct. 851.[31] Relevant evidence that was excluded or unavailable at trial should be considered.[32] *Id.* The appellants' burden on remand is not to persuade the trial court that the available evidence, if credited, *could* raise a reasonable doubt in the mind of a reasonable juror, but that a reasonable juror, faced with the newly-available evidence, probably *would* not have found

> client I have, is that my client could not possibly have done it because somebody else did it.
> The Court: Does it point a finger at who did it?
> Counsel: Yes, Your Honor, it does. I can't bring that out at this time because of the Court's ruling.

**30.** In light of the conclusion that § 23–110(a)(1) is an appropriate vehicle to address appellants' constitutional claims, it is not necessary to address whether § 23–110(a)(4), which provides relief if "the sentence is otherwise subject to collateral attack," is available for a collateral attack based solely on new evidence outside the parameters of Super. Ct.Crim. R. 33, which requires that motions for new trial on the basis of newly-discovered evidence must be filed within two years of final judgment. The question is unsettled. *See Guinan v. United States,* 6 F.3d 468, 470–71 (7th Cir.1993); *but see Herrera, supra,* 506 U.S. at 417, 113 S.Ct. 853; *United States v. Kearney,* 212 U.S.App. D.C. 319, 322, 659 F.2d 1203, 1206 (1981) (MacKinnon, J., dissenting).

**31.** The hearsay nature of parts of the affidavits of Grayson, Lurz and Richter is, therefore, not a bar to their consideration by the trial court for the purpose of determining whether the gateway standard has been met.

**32.** On remand the trial court also should reevaluate its decision not to consider affidavits that contradict Willetts' trial testimony in the context of the other evidence being presented of appellants' innocence.

them guilty beyond a reasonable doubt. *See id.* at 329, 115 S.Ct. 851. In making that determination, the trial court may need to make some preliminary credibility determinations, *see id.* at 330, 115 S.Ct. 851, and "assess the probative force of the newly-presented evidence in connection with the evidence of guilt addressed at trial." *Id.* at 332, 115 S.Ct. 851; see *supra* note 7.

I turn, therefore, to address the trial court's decision to deny the § 23–110 motion without holding an evidentiary hearing. Section 23–110(c) mandates a hearing "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." We have previously stated that "[t]here is a presumption that a trial court presented with a § 23–110 motion should conduct a hearing. 'Because § 23–110 is virtually a remedy of last resort, any question whether a hearing is appropriate should be resolved in the affirmative.'" *Gaston v. United States,* 535 A.2d 893, 900–01 (D.C.1988) (quoting *Miller v. United States,* 479 A.2d 862, 869 (D.C.1984)). This presumption can be overcome only when the trial court concludes that "'under no circumstances could the petitioner establish facts warranting relief.'" *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990) (quoting *Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973)). There are three categories of allegations that do not warrant a hearing: "(1) vague and conclusory allegations, (2) palpably incredible claims, and (3) assertions that would not merit relief even if true." *Ramsey, supra,* 569 A.2d 142, 147; see *Pettaway v. United States,* 390 A.2d 981, 984 (D.C.1978).

The trial court's denial of a hearing was based on its belief that appellants' motion was

> exclusively based on the incredible affidavit of Jones, the vague observations of Gianaris, and the conclusory affidavits of other persons whose testimony, even if accepted, would only impeach the Government's witness, Willetts. Additionally, the constitutional claims which Defendants present are wholly without merit and do not state a factual basis which would necessitate an evidentiary hearing.

In this context, appellants' constitutional claims cannot be said to be "wholly without merit." To the contrary, their claims of constitutional deprivation would appear to be meritorious unless decided to be harmless beyond a reasonable doubt—an impossible conclusion if appellants' new evidence is credible.

The trial court also erred in determining that the affidavits were incredible, vague and conclusory without first holding an evidentiary hearing. Chief Judge Moultrie presided over the trial in 1976 and entertained Eastridge's and Diamen's earlier collateral attacks. The trial judge ruling on the current § 23–110 motion, however, did not have the benefit of hearing the testimony at trial and weighing the credibility of the various witnesses, particularly Jones. *See Gaston, supra,* 535 A.2d at 900 (holding that the lack of a § 23–110 hearing was "especially significant" when trial judge reviewing the petition was not the presiding judge at the sentencing). In its order denying a hearing, the trial court relied to a large extent on Chief Judge Moultrie's previous rulings on Eastridge's and Diamen's § 23–110 motions and this court's affirmance of those rulings. *But see Pettaway, supra,* 390 A.2d at 986 (noting that strict principles of *res judicata* do not apply in proceedings under § 23–110(e)). For example, the trial court's determination that Jones' recantation contained in his affidavit was incredible was based in part on Chief Judge Moultrie's earlier determination in Eastridge's first collateral attack and this court's subsequent affirmance. Although the substance of Jones' recantation is substantially the same, the form of the recantation is different in a significant way. Chief Judge Moultrie had discounted the information presented in the earlier collateral attack because it was in the form of hearsay statements recounted in the affidavit of a defense investigator. In contrast, the information now being presented to the court is in the form of an affidavit signed by Jones himself. The trial court's concerns about the veracity of Jones' hearsay statements in the earlier sub-

mission[33] are mitigated by Jones' apparent willingness at this time to risk prosecution for perjury committed at trial. Presented with these different circumstances, the trial court's reliance on former determinations of credibility was unfounded, especially when it has never had an opportunity to hear Jones' testimony. The trial court also discredited Jones' affidavit because his affiliation with the Pagans was evidence of bias and because Jones implicated individuals who are now deceased. While these are factors to be considered in evaluating Jones' credibility, *cf. Schlup, supra,* 513 U.S. at 308 n. 18, 115 S.Ct. 851, they do not establish that Jones' recantation is so palpably incredible that it does not warrant the hearing presumptively required by statute. *See Wright v. United States,* 608 A.2d 763, 766 (D.C.1992) (remanding for a hearing because claim was not palpably incredible).

The trial court dismissed the Gianaris affidavit as too vague. Commenting on the substance of the affidavit, the trial court stated that Gianaris' statement, "I do not believe I saw more than four white men [attack Battle]" was "vague and not convincing." The trial court concluded that Gianaris' statement was too indefinite to overcome the jury verdict, and to meet the "extraordinary high standard of actual innocence," under *Herrera.* First, as discussed earlier, see *supra* note 21, the *Herrera* standard for a freestanding claim of actual innocence is higher than is required where, as here, a claim of actual innocence supplements a claimed constitutional violation. *See Schlup, supra,* 513 U.S. at 316, 115 S.Ct. 851. Second, while Gianaris' statement does not identify or pinpoint the exact number of individuals involved in the murder, when viewed in the context of the other affidavits stating that only four individuals—Woods, Jones, Jennings and another unidentified person—at-

tacked Battle, Gianaris' affidavit does support appellants' failed attempt at trial to show that they were not among the chasers or attackers.[34] In his affidavit Gianaris also expressly states that he did not see a car arrive during or after the murder. Gianaris' affidavit is neither so vague nor so conclusory on its face as to make an evidentiary hearing unnecessary. *Cf. Pettaway, supra,* 390 A.2d at 985 (statements too vague and conclusory to warrant hearing). The trial court also questioned Gianaris' credibility because he waited almost twenty years before disclosing what he saw on the night of the murder. Determinations of an affiant's credibility, motive or bias can only be resolved after the benefit of live testimony. *See Rice v. United States,* 580 A.2d 119, 123 & n. 7 (D.C.1990) (finding no grounds for rejecting the credibility of witnesses based solely on their written statements). There is no reason evident on the record before us for Gianaris to fabricate the information he provides in his affidavit. On the other hand, it is easy to conceive of reasons why an eyewitness bystander would be reluctant to come forward in a racially-tainted murder involving members of a motorcycle gang. Gianaris' reasons for waiting twenty years to disclose what he knew about the murder of Johnnie Battle are best aired at an evidentiary hearing.

The trial court did not specifically address the substance of the affidavits signed by Richter, Lurz and Grayson when it denied appellants' request for an evidentiary hearing. Rather, the trial court rejected their affidavits as biased because of the affiants' membership in the Pagans and because the information contained in the affidavits was hearsay. As already discussed, whether the affidavits would be admissible at trial is not dispositive for purposes of the gateway inquiry into actual innocence.[35] While affiants'

---

33. See page 519, *supra.*

34. It is undisputed that appellants could have been found guilty as aiders and abettors even if they were not principals in the attack. See *supra* note 7. However, where there has been a constitutional violation, neither the government's burden under § 23–110 to show harmlessness beyond a reasonable doubt, nor the appellants' burden under the miscarriage of justice excep-

tion to show that it is "more likely than not" that they would not have been convicted, are overcome by a determination that the evidence would have been sufficient to convict. *See Schlup, supra,* 513 U.S. at 331, 115 S.Ct. 851; *Flores v. United States,* 698 A.2d 474, 480–81 (D.C.1997).

35. Because the trial court rejected the affidavits without a hearing, appellants were not given an opportunity to argue that the third party state-

membership in the Pagans raises concern regarding their bias, this is not by itself, and without a hearing, sufficient reason to reject the affidavits as "palpably incredible" on their face. The credibility of their statements—including the fact that they exculpate appellants at the expense of two other former Pagans who are now deceased—must be tested at an evidentiary hearing.

## V.

Appellants requested access to grand jury testimony and other discovery in an effort to find out more information about the events surrounding the murder.[36] The trial court denied appellants' request because the request was not narrowly tailored and appellants' need for the grand jury testimony did not outweigh the need for its secrecy. Appellants contend, based on the new information brought to light by Centurion Ministries, that the government has information that will help them prove their innocence at a § 23–110 hearing. The government denies that it has any exculpatory information and argues that appellants' request is not sufficiently narrowly tailored.

Generally, Super. Ct.Crim. R. 6(e)(2) prohibits disclosure of "matters occurring before a grand jury." Rule 6(e)(3)(C)(i), however, creates an exception to the general rule by allowing the trial court to order disclosure of grand jury testimony when there has been a "strong showing of particularized need." *Law v. United States*, 488 A.2d 914, 916 (D.C.1985) (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 434, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983)). In addition, the party moving for disclosure must show that "(1) the material he seeks is needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request is structured to cover only

needed materials." *Id.* Whether to order disclosure is within the trial court's discretion. *See id.*

Appellants argue that the policies underlying the secrecy of grand jury testimony are no longer applicable in this case. These policies have been articulated as follows:

(1) [t]o prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberation, and to prevent persons subject to indictments or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Davis v. United States*, 641 A.2d 484, 488 (D.C.1994) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681–82 n. 6, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (in turn quoting *United States v. Rose*, 215 F.2d 617, 628–29 (3d Cir.1954))). Against these policies, the need for secrecy is not compelling in this case, where more than twenty years have lapsed since the deliberations of the grand jury, certain individuals have consented to the release of their grand jury testimony, and other witnesses have died. Further, to the extent that the requested grand jury testimony assists sufficiently in establishing appellants' innocence to reopen the case, it is necessary in order to avoid a possible injustice.

---

ments contained in the affidavits of Richter, Lurz and Grayson were not inadmissible hearsay, but rather, would be admissible as statements against the declarants' penal interests. *See Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (addressing scope of exception for declarations against interest). At the hearing the trial court can revisit this issue, if necessary, with the benefit of arguments from the parties. *See id.* at 604, 114 S.Ct. 2431

(noting that whether statement is against penal interest "can be a fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved.")

**36.** Appellants' specific request is not part of the record.

While decisions to deny post-trial discovery are within the trial court's discretion, we have previously stated that "the trial court must not act 'arbitrarily or willfully but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.'" *Gibson v. United States,* 566 A.2d 473, 478 (D.C.1989) (quoting *Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979)). This court, when reviewing a trial court's decision denying access to post-trial discovery, "need not be reticent to declare that a trial court's determination constitutes an erroneous exercise of discretion."[37] *Id.* at 479 (quoting *Johnson, supra,* 398 A.2d at 366 n. 9). Considering the new evidence in the context of the appellants' claims of actual innocence and their constitutional claims, it is in the interest of justice that appellants' reasonable discovery requests be allowed so that the trial court may have the benefit of all relevant evidence when considering appellants' § 23–110 motion on remand. If, after taking all the available evidence into account, the trial court determines that appellants' motion brings them within the "special circumstances" exception, as established here, their convictions must be vacated because they are entitled to a new trial.

37. *Gibson* held that the trial court abused its discretion in part because it did not consider the affidavit of a veteran police officer, which provided compelling information exonerating Gibson, and because there was sufficient information warranting further investigation. 566 A.2d at 479.